DOE v DEPARTMENT OF SOCIAL SERVICES

Docket Nos. 91092, 91093. Argued November 7, 1991 (Calendar No. 12). Decided June 9, 1992.

Jane Doe, a fifteen year old who became pregnant as a result of rape, and Nancy Doe, her mother, both indigent women eligible to receive medical assistance through the state's Medicaid program, brought a declaratory action in the Wayne Circuit Court against the Department of Social Services, seeking a permanent injunction prohibiting enforcement of MCL 400.109a; MSA 16.490(19a), which precludes the use of public funds to pay for an abortion unless it is necessary to save the mother's life. The plaintiffs alleged that the refusal to pay for a therapeutic abortion pursuant to § 109a violates the equal protection guarantee of the Michigan Constitution in that it accords unequal treatment of two classes of indigent, pregnant women—those who choose childbirth and those who choose abortion. The court, John H. Hausner, J., granted summary disposition for the defendant, ruling that § 109a does not violate the Michigan Constitution. The Court of Appeals, DOCTOROFF and J. W. FITZGERALD, JJ. (SULLIVAN, P.J., dissenting), reversed, finding that Michigan's Equal Protection Clause offers greater protection than its federal counterpart and that § 109a impinges upon a state right to an abortion and thus violates Michigan's Equal Protection Clause (Docket No. 116069). The department appeals.

In an opinion by Justice GRIFFIN, joined by Chief Justice CAVANAGH, and Justices LEVIN, BRICKLEY, and RILEY, the Supreme Court *held:*

The Equal Protection Clause of the Michigan Constitution permits the state to fund the expenses of childbirth, even though it does not fund abortions.

1. Both the state and federal constitutions guarantee equal protection of the laws. Neither, however, requires absolute

REFERENCES

Am Jur 2d, Abortion §§ 1.5, 37.5; Welfare Laws § 72.6.

Validity of state statutes and regulations limiting or restricting public funding for abortions sought by indigent women. 20 ALR4th 1166.

equality. Even if a law treats groups of people differently, it will not necessarily violate the guarantee. The equal protection guarantee is not a source of substantive rights or liberties; rather, it is a measure of the constitution's tolerance of government classification schemes. When legislation is challenged as violative of the equal protection guarantee under either constitution, it is subjected to judicial scrutiny to determine whether the goals of the legislation justify the differential treatment it authorizes. Generally, the legislation is accorded a presumption of constitutionality. Unless the classification scheme is suspect or impinges upon the exercise of a fundamental right, such legislation is reviewed by applying a rational basis standard under which it will not be struck down if the classification scheme it creates is rationally related to a legitimate governmental purpose.

2. *Roe v Wade,* 410 US 113 (1973), did not establish an unqualified right to an abortion under the federal constitution; rather, the federal right shields a woman from unduly burdensome interference with the freedom to decide whether to terminate a pregnancy. Refusal by the government to provide funding for an abortion does not interfere with a woman's right to choose an abortion. Assuming for the sake of argument a state constitutional right to abortion coextensive with the federal right, § 109a does not violate the Michigan Constitution. There is no evidence that the framers of the Michigan Constitution intended to provide protection in the Equal Protection Clause broader than that found in its federal counterpart; rather, the pattern and arrangement of the clause suggests a deliberate effort to duplicate the protection secured by the federal clause, to affirm and incorporate the basic notions of equal protection that prevailed at the time of Michigan's Constitutional Convention.

3. In the absence of some burden on the government to provide funds for the exercise of a right, a decision by the Legislature not to fund the exercise of a right is distinct from legislative action that impinges upon that right. Even where the state previously has funded the exercise of a right, it is not required to continue such funding. When the state offers a particular benefit to persons receiving public assistance, it retains the power to substitute a different, less valuable entitlement at a later date, and the recipient is not deprived of due process when benefit levels are adjusted.

4. The right involved in this case is not a right to continue to receive funds that were offered in the past; rather, it is the right to choose an abortion without unduly burdensome govern-

ment interference. An indigent woman who desires an abortion suffers no disadvantage as a consequence of the state's decision to fund childbirth. She continues as before to be dependent on private sources for the service she desires. Similarly, an indigent woman who desires an abortion is not excluded from the Medicaid program. Whether she decides to terminate her pregnancy or to carry to term, she is treated in the same way that any other Medicaid-qualified pregnant woman is treated, i.e., she is offered reimbursement for the expenses of childbirth, but not for the expenses of an abortion. The election to subsidize childbirth does not impermissibly influence the procreative decisions of indigent women. Nor does it coerce a woman into forfeiting her right to choose an abortion. The state may have made childbirth a more attractive option by paying for it, but it has imposed no restriction on obtaining an abortion that was not already there. Thus, the state's decision to fund childbirth, but not abortion, does not impinge upon the exercise of a fundamental right provided by the Michigan Constitution.

5. Because § 109a does not impinge upon the exercise of a fundamental right, and because, at least with respect to the funding of abortions, the equal protection guarantee of the Michigan Constitution does not offer greater protection than its federal counterpart, the proper standard of review is the rational basis test. The Court of Appeals erred when it subjected § 109a to strict scrutiny. Section 109a is rationally related to the legitimate governmental purpose of protecting potential life and promoting childbirth and in allocating state benefits in a way that reflects its determination of the public policy of the state. The state has no constitutional obligation to remain neutral regarding abortion any more than it has an obligation to remain neutral with respect to the exercise of other fundamental rights. The Michigan Constitution does not require a government without values; it requires only that, in the pursuit of certain values, the state will not improperly interfere with the exercise of fundamental rights.

Justice LEVIN, concurring, stated that § 109a does not establish an unconstitutional eligibility criterion in proscribing the use of public funds to provide medically indicated abortions to indigent women. It does not deny any woman access to medical benefits that other persons are entitled to receive. Rather, it provides that a particular benefit, the funding of abortion, is no longer to be provided. There is no eligibility criterion by which any woman might obtain a publicly funded abortion.

No constitutional principle makes or constitutes all legislation that affects only one sex suspect, especially legislation

concerning a subject matter that can affect only one sex. The Due Process Clause protects the right to seek shelter, food, and medical service free from unreasonable government restrictions, but it does not obligate the government to provide them. The Equal Protection Clause does not endow the judiciary with the power to supervise the allocation of public funds or to require that neutral principles be announced.

The legislative decision to provide funds for the medical expenses of childbirth does not impermissibly burden the right to choose abortion. While the government may not interfere with or prohibit the right to choose abortion, it need not support it with public funds even though it does support childbirth with public funds. The concept of government neutrality on the question is fallacious. Even if neutrality with respect to fundamental rights were possible, such a stance would not result in sound governance, but rather in no governance at all. The government must express some set of values if it is to govern. It is not the role of the judiciary, however, to decide which values properly may be taken into account in choosing the medical benefits to be provided by the government. The resources of governments are limited, and the decision to include one benefit while excluding another necessarily reflects some value choice, a task largely to be left to the representative branches of government. Judicial power is most forcefully asserted when a court refrains from arrogating to itself decisions properly entrusted to the other branches. While it may be unfair to deprive only indigent women of the funds to terminate pregnancy, the people and the Legislature have decided otherwise. There is no basis in the Michigan Constitution to reverse that result.

Reversed.

Justice MALLETT, dissenting, stated that § 109a is an unduly burdensome interference with an indigent woman's fundamental right of privacy that includes the right to choose to terminate her pregnancy that is encompassed in the equal protection guarantees of the Michigan Constitution.

Although United States Supreme Court case law has held that denying Medicaid funding for medically indicated abortions for indigent women that are not required to save their lives does not impinge upon their fundamental right to privacy under the federal constitution, the Michigan Supreme Court is not precluded from independently interpreting Michigan's Equal Protection Clause more broadly than the federal and rejecting the analyses of the United States Supreme Court. However, it is unnecessary to reach a broader interpretation in

this case; § 109a impinges upon the fundamental privacy right of indigent women and thus is unconstitutional and subject to strict scrutiny, requiring the government to demonstrate a compelling interest underlying the act.

*Roe v Wade* identified two governmental interests: a woman's health and the potential life of a fetus. Because the government's interest in the potential life of a fetus does not become compelling until the fetus is viable, its interest in a woman's health must be examined. The prohibition of reimbursement for abortions under § 109a in all trimesters does not advance this interest. Rather, it exceeds the balance between the government's interest and the constitutional right of the woman to be free from government interference in her procreative decisions. The decision of the Michigan Legislature to deny Medicaid reimbursements to an indigent woman who seeks a medically indicated abortion, but to provide funding to a woman who chooses childbirth as a medical treatment for her pregnancy, cannot survive strict scrutiny analysis. Michigan is bound by *Roe v Wade.* To argue that a woman has a right to an abortion, but that the government need not allow her access to this service, renders *Roe v Wade* meaningless.

Michigan's equal protection guarantees are based on the premise that laws must not unfairly prejudice similarly situated persons. The Michigan Legislature does not possess unlimited authority to enact laws on the basis of popular moralistic objectives that encroach upon constitutionally protected freedoms. When this occurs, the courts are entrusted with the responsibility to review and the power to nullify legislative acts which are repugnant to the constitution.

Justice Boyle, dissenting, stated that § 109a should not be applied to women who seek first-trimester abortions necessary to preserve medical health.

Section 109a does not survive analysis under the Michigan Constitution in that it burdens a fundamental right by selectively denying benefits for first-trimester, medically necessary abortions. It selectively focuses on one of two choices involving a constitutionally protected decision and penalizes the exercise of the disfavored option, requiring women to sacrifice their medical needs in the first trimester of pregnancy to the interest of the state in potential life. Although the state has no obligation to fund private choice, when it opts to fund medical procedures concerning pregnancy for indigent women, it may not penalize the disfavored option by conditioning the receipt of benefits on waiver of the protected right. A statute that makes serious health damage to the mother a more attractive alternative than abortion does not rationally promote the govern-

ment's interest in encouraging normal childbirth when analyzed under either strict or intermediate scrutiny.

187 Mich App 493; 468 NW2d 862 (1991) reversed.

CONSTITUTIONAL LAW — EQUAL PROTECTION — INDIGENTS — ABORTION.

The Equal Protection Clause of the Michigan Constitution permits the state to fund the expenses of childbirth, even though it does not fund abortions (Const 1963, art 1, § 2; MCL 400.109a; MSA 16.490[19a]).

American Civil Liberties Union Fund of Michigan (by *Elizabeth Gleicher, Paul J. Denenfeld,* and *Robert A. Sedler*) for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *John Wernet* and *John M. Konwinski,* Assistant Attorneys General, for the defendants.

*Dykema, Gossett* (by *John B. Curcio, Richard D. McLellan,* and *Ronald J. Torbert*) for the intervening defendants.

Amici Curiae:

*William J. Coughlin, Clarke D. Forsythe,* and *Kevin J. Todd* for Michigan Senators and Representatives and Americans United for Life.

*Joseph W. Dellapenna* for the American Academy of Medical Ethics.

*Mark Granzotto, Monica Farris Linkner,* and *Charles P. Burbach* for the Michigan Trial Lawyers Association.

*Varnum, Riddering, Schmidt & Howlett* (by *Robert J. Eleveld* and *Teresa S. Decker*); *May & May, P.C.* (by *Alan A. May*), for Michigan's Republicans for Choice.

*George E. Bushnell, Jr., Gregory L. Curtner,
Abigail Elias, Megan P. Norris, Ellen M. Tickner,
Carl H. Von Ende,* and *John H. Willems* for Michigan Nurses Association and Detroit Medical Society.

*Marcy J. Wilder, Dawn Johnsen,* and *Lois Eisner Murphy;* (*Deborah Levine, Nory Miller,* and *Michael C. Small,* of counsel), for National Abortion Rights Action League, Michigan Abortion Rights Action League, and forty-five national and Michigan organizations committed to women's equality.

*James K. Robinson, Marietta S. Robinson,* and *Joanne Fitzgerald Ross* for the Detroit Chapter of National Organization of Women of Michigan, the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), the League of Women Voters of Michigan, Michigan Welfare Rights Organization, the National Counsel of Jewish Women, Greater Detroit Section, Inc., Planned Parenthood League, Inc., the Religious Coalition for Abortion Rights, the Wolverine Bar Association, and the Women Lawyers Association of Michigan.

*Gail S. Benson* for the Women's Law Caucus, National Lawyer's Guild, "The Coalition" Students for Choice, and Wayne State University Gay and Lesbian Law Caucus.

GRIFFIN, J. A statute which became law as the result of a vote of the people of Michigan prohibits the use of public funds to pay for an abortion unless the abortion is necessary to save the moth-

er's life. We are required to decide whether that statute, § 109a of the Social Welfare Act,[1] violates the equal protection guarantee of the Michigan Constitution.[2] The trial court, following related decisions of the United States Supreme Court, found no constitutional violation.[3] A divided panel of the Court of Appeals then reversed. The majority found that Michigan's Equal Protection Clause offers greater protection than its federal counterpart[4] and that § 109a impinges upon a state right to an abortion; thus, the majority concluded that § 109a does violate the Equal Protection Clause of the Michigan Constitution.[5]

In reviewing the decision of the Court of Appeals, we emphasize the limited scope of the question presented. This case does not concern a woman's right under the federal constitution to choose to terminate her pregnancy. That right, articulated for the first time in *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), reh den 410 US 959 (1973), is not, nor could it be, restricted by our decision today. Rather, this case concerns whether § 109a exceeds the limits of equal protection established by our state constitution. We conclude that it does not and reverse the decision of the Court of Appeals.

[1] MCL 400.1 *et seq.;* MSA 16.401 *et seq.*

[2] The 1963 Constitution contains two clauses relating to equal protection. Art 1, § 1 states, "[a]ll political power is inherent in the people. Government is instituted for their equal benefit, security and protection." Art 1, § 2 states, "[n]o person shall be denied the equal protection of the laws . . . ." These provisions will be referred to as the Equal Benefit Clause and the Equal Protection Clause, respectively.

[3] In the circuit court, the plaintiffs alleged several constitutional violations—violations of the Due Process Clause (art 1, § 17), the right of privacy (art 1, § 23), the right of equal protection of the laws (art 1, §§ 1, 2), and the right of protection of civil rights (art 1, § 2).

[4] US Const, Am XIV, § 1.

[5] 187 Mich App 493; 468 NW2d 862 (1991).

I

As the result of an initiative petition, a legislative proposal which became § 109a was placed before, and adopted by, the Legislature in 1987.[6] Thereafter, in response to a referendum petition, the measure was submitted to the electorate and approved by the voters in the 1988 election.[7] Section 109a amended the Social Welfare Act, which provides authority for Michigan's participation in the Medicaid program.[8] Jointly funded by the federal government and state governments that choose to participate,[9] the Medicaid program provides reimbursement for medical services to needy persons.

The costs of nearly all medically appropriate services required by qualified participants are reimbursed through the Medicaid program. One exception is reimbursement for abortion. In 1976, Congress passed the first of the so-called Hyde Amendments,[10] which prohibited the use of federal funds to pay for the costs of an abortion under the Medicaid program unless the abortion was neces-

---

[6] The powers to propose laws, and to approve or disapprove laws enacted by the Legislature are reserved to the people by Const 1963, art 2, § 9.

[7] Pursuant to MCL 168.471 et seq.; MSA 6.1471 et seq., the initiative petition was filed with the Secretary of State on April 30, 1987. The petition was certified on June 12, 1987, by the Board of Canvassers and submitted to the Legislature as 1987 PA 59. 1987 PA 59 was enacted by the Legislature on June 23, 1987; however, before it became effective, a second petition was presented to the Secretary of State to have 1987 PA 59 placed on the ballot and subjected to a referendum vote of the people. This petition was certified by the Board of Canvassers, and 1987 PA 59 was placed on the November 1988 ballot.

[8] The Medicaid program was established by Congress in 1965 as part of the Social Security Act. 42 USC 1396 et seq.

[9] See 42 USC 1396d(b).

[10] PL 94-439, § 209, 90 Stat 1434.

sary to save the life of the pregnant woman.[11]
After federal funding for Medicaid abortions was
withdrawn, Michigan provided one hundred per-
cent of the funds required until § 109a became
effective. Section 109a provides:

> Notwithstanding any other provision of this act,
> an abortion shall not be a service provided with
> public funds to a recipient of welfare benefits,
> whether through a program of medical assistance,
> general assistance, or categorical assistance or
> through any other type of public aid or assistance
> program, unless the abortion is necessary to save
> the life of the mother. It is the policy of this state
> to prohibit the appropriation of public funds for
> the purpose of providing an abortion to a person
> who receives welfare benefits unless the abortion
> is necessary to save the life of the mother. [MCL
> 400.109a; MSA 16.490(19a).]

This lawsuit was filed against two state officials
responsible for administration of the Medicaid
program.[12] At the time of the filing of their com-
plaint, plaintiffs Jane Doe and her mother, Nancy
Doe,[13] were indigent women eligible to receive
medical assistance through the state's Medicaid
program. Their complaint alleged that Jane Doe,
then fifteen years old, had become pregnant when
she was raped in January 1989. Nancy Doe re-
quested medical assistance for a first trimester
abortion for her daughter to protect her daughter's
physiological and psychological health. According
to the complaint, Jane Doe had been affected

[11] Subsequent versions of the Hyde Amendment have been enacted
by Congress. One version was upheld by the United States Supreme
Court. See *Harris v McRae,* 448 US 297, 302-303; 100 S Ct 2671; 65 L
Ed 2d 784 (1980), reh den 448 US 917 (1980), discussed below.

[12] Several organizations and a number of individuals were allowed
to intervene as defendants.

[13] The identity of the plaintiffs was revealed to the trial court in
camera.

periodically by an unspecified seizure disorder, and it was feared that her pregnancy would aggravate the disorder. In addition, both Jane Doe and her mother believed that an abortion would reduce the emotional trauma associated with the pregnancy. However, neither the plaintiffs nor Jane Doe's physician represented that an abortion was necessary to save Jane Doe's life.

In accordance with § 109a, the Michigan Department of Social Services refused to pay for the requested abortion. That refusal prompted this lawsuit. In the complaint, plaintiffs maintained that § 109a violates the Michigan Constitution, specifically its Equal Protection, Due Process, and Civil Rights Clauses, as well as a claimed right to privacy. As relief, plaintiffs sought a declaratory judgment and a permanent injunction prohibiting enforcement of § 109a.

After minimal discovery, defendants filed a motion for summary disposition.[14] The trial court, relying on *People v Bricker,* 389 Mich 524; 208 NW2d 172 (1973), and citing two United States Supreme Court cases, *Harris v McRae,* 448 US 297; 100 S Ct 2671; 65 L Ed 2d 784 (1980), reh den 448 US 917 (1980), and *Maher v Roe,* 432 US 464; 97 S Ct 2376; 53 L Ed 2d 484 (1977), ruled that § 109a does not violate the Michigan Constitution. Thus, it granted the motion for summary disposition and dismissed the suit.[15] Thereafter, a divided panel of the Court of Appeals reversed, 187 Mich App 493; 468 NW2d 862 (1991), and this Court

---

[14] MCR 2.116(C)(10).

[15] Within hours of the trial court's ruling, Jane Doe received an abortion paid for with donated private funds. Although her abortion may render the case moot, we consider it appropriate to decide this case. "A disposition based on mootness is not required where the underlying conduct is capable of repetition, yet evades review." *Mead v Batchlor,* 435 Mich 480, 487; 460 NW2d 493 (1990). In addition, this case raises an issue of sufficient public importance that a decision on the merits is warranted. *Id.*

then granted leave to appeal. 437 Mich 1047 (1991).

## II

Our state constitution declares that "[n]o person shall be denied the equal protection of the laws . . . ."[16] The wording of the parallel clause in the federal constitution is almost identical. It provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[17] In this case, plaintiffs complain that § 109a accords unequal treatment between two classes of Medicaid-qualified, pregnant women—those who choose childbirth and those who choose abortion. The women who choose childbirth receive reimbursement for medical expenses related to childbirth, while those who choose abortion receive no reimbursement for the expenses related to abortion. Of course, it is well established that even if a law treats groups of people differently, it will not necessarily violate the guarantee of equal protection. Neither constitution has been interpreted to require "absolute equality." *San Antonio Independent School Dist v Rodriguez,* 411 US 1, 24; 93 S Ct 1278; 36 L Ed 2d 16 (1973), reh den 411 US 959 (1973). Likewise, it is well established that the equal protection guarantee is not a source of substantive rights or liberties; rather, it is a measure of our constitution's tolerance of government classification schemes. *Id.,* 411 US 58 (Stewart, J., concurring).

Thus, when legislation is challenged as violative of the equal protection guarantee under either

---

[16] Const 1963, art 1, § 2.

[17] US Const, Am XIV, § 1. The Fifth Amendment has been interpreted to contain an equal protection component that is applied to the federal government. *Harris, supra,* 448 US 321.

constitution, it is subjected to judicial scrutiny to determine whether the goals of the legislation justify the differential treatment it authorizes. As the Court of Appeals panel concedes, in deciding such cases the appellate courts of this state have employed a mode of analysis similar to that which has been developed by the United States Supreme Court. 187 Mich App 510.[18] Generally speaking, legislation challenged on equal protection grounds is accorded a presumption of constitutionality, and it is reviewed by applying a rational basis standard. *Shavers v Attorney General,* 402 Mich 554, 613; 267 NW2d 72 (1978). Under that standard, a statute will not be struck down if the classification scheme it creates is rationally related to a legitimate governmental purpose. *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975).

On the other hand, in two situations the equal protection guarantee is less tolerant of legislation that creates a classification scheme—when the classification is based upon suspect factors (such as race, national origin, or ethnicity), or when the legislation that creates the classification impinges upon the exercise of a fundamental right. *Plyler v Doe,* 457 US 202, 216-217; 102 S Ct 2382; 72 L Ed 2d 786 (1982), reh den 458 US 1131 (1982). In these situations, a higher standard of review, strict scrutiny, is applied. A statute reviewed under this strict standard will be upheld only if the state demonstrates that its classification scheme has been precisely tailored to serve a compelling governmental interest. *Id.*[19]

---

[18] For example, see *Manistee Bank & Trust Co v McGowan,* 394 Mich 655, 668; 232 NW2d 636 (1975). See also *Fox v Employment Security Comm,* 379 Mich 579; 153 NW2d 644 (1967); *Alexander v Detroit,* 392 Mich 30; 219 NW2d 41 (1974).

[19] Although these two tiers of review have been the basis of most

III

While recognizing that plaintiffs base their case on the state constitution, we believe a brief review of the reasoning that underlies related decisions of the United States Supreme Court is instructive. In a series of cases, that Court has held that the Hyde Amendment and state statutes which restrict Medicaid funding of abortions do not violate the equal protection guarantee of the federal constitution.

In *Maher,* the Court upheld a Connecticut statute that limited state funding to medically necessary abortions performed during the first trimester of pregnancy.[20] A few years later, in *Harris,* the Court reaffirmed *Maher* and validated a version of the Hyde Amendment that allowed Medicaid abortion funding only when the mother's life was in danger or when she had become pregnant as the result of rape or incest.[21] Finally, in *Williams v Zbaraz,* 448 US 358; 100 S Ct 2694; 65 L Ed 2d 831 (1980), the Court upheld an Illinois statute that mirrors § 109a; it provided Medicaid funding for abortion only when the woman's life was threatened by the pregnancy.

Under its analysis, the *Maher* Court first determined that indigent women desiring abortions did not constitute a suspect class. After noting that no

equal protection analysis, there are cases in which the courts have used a middle tier of heightened scrutiny. This middle tier requires that the challenged classification scheme further a substantial governmental interest. *Plyler,* 457 US 217. Typically, this middle tier has been applied to classifications based on gender or mental capacity. See, for example, *Craig v Boren,* 429 US 190; 97 S Ct 451; 50 L Ed 2d 397 (1976), reh den 429 US 1124 (1977). However, it has not been so restricted. See *Plyler v Doe; Metro Broadcasting v FCC,* 497 US 547; 110 S Ct 2997; 111 L Ed 2d 445 (1990). See also *Manistee Bank & Trust Co, supra.*

[20] See also *Beal v Doe,* 432 US 438; 97 S Ct 2366; 53 L Ed 2d 464 (1977).

[21] PL 96-123, § 109, 93 Stat 926.

such suspect class had been recognized in earlier decisions, *id.* at 470-471,[22] the Court found that the challenged legislation did not create a suspect classification even though the effect of the legislation fell upon those who could not pay: "[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis." *Id.* at 471. Thus, the Court turned to the question whether the statute impinged upon the exercise of a fundamental right.

The underlying fundamental right was the right of privacy as articulated in *Roe v Wade, supra.* In *Beal v Doe,* 432 US 438, 454; 97 S Ct 2366; 53 L Ed 2d 464 (1977), the Court declared that the right of privacy in the federal constitution includes "the abortion decision." However, in *Maher,* the nature and scope of the right established in *Roe* was clarified. The Court said, "*Roe* did not declare an unqualified 'constitutional right to an abortion,' as the District Court seemed to think. Rather, the right protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy." *Maher,* 432 US 473-474. The decision's focus then shifted to the effect of the government's refusal to fund an abortion on the woman's freedom to choose. It concluded that a refusal by government to provide funding for an abortion did not interfere with the right of a woman to choose an abortion:

> The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a

[22] Typically, the Court will look for some "indicia of suspectness." These indicia include a history of purposeful unequal treatment or a degree of political powerlessness that commands extraordinary protection from the majoritarian political process. *San Antonio School Dist,* 411 US 28.

consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. [*Id.* at 474.]

The United States Supreme Court has held in other cases that a legislature's election not to fund the exercise of a fundamental right does not impinge upon that right, *Regan v Taxation with Representation,* 461 US 540; 103 S Ct 1997; 76 L Ed 2d 129 (1983).[23] For example, private schools, though constitutionally permitted, have never been entitled to support from the state under the Equal Protection Clause: "It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid." *Norwood v Harrison,* 413 US 455, 462; 93 S Ct 2804; 37 L Ed 2d 723 (1973).

Moreover, abortion funding cannot be equated to situations where public funding is required because the government has monopoly control over the means of exercising a fundamental right.[24] The government has no monopoly on the performance

---

[23] In *Regan,* the denial of tax-exempt status for a nonprofit corporation was upheld because the corporation intended to devote substantial amounts of its time to lobbying. The Court held that there was no obligation on Congress to support the corporation's lobbying with a tax exemption, even though the right to lobby the government is fundamental.

[24] See, for example, *Boddie v Connecticut,* 401 US 371; 91 S Ct 780; 28 L Ed 2d 113 (1971). In *Boddie,* the Court struck down a court fee which precluded indigent women from going into court to obtain a divorce. Because the state court system was the only system empowered to dissolve marriages, the fee was found to violate due process requirements. Jane Doe's case more closely resembles *Kadrmas v Dickinson Public Schools,* 487 US 450, 460; 108 S Ct 2481; 101 L Ed 2d 399 (1988). In *Kadrmas,* a school district in North Dakota ended its policy of providing free transportation to school and began charging a fee for bus service. The plaintiffs, a family living near the poverty

of abortions or on the means to pay for abortions. Private clinics perform abortions, and, as in Jane Doe's case, private funds can be made available for that purpose.

In determining that government's failure to fund abortion does not impinge upon the exercise of a fundamental right, the *Harris* Court explained, "[I]t simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices." 448 US 316. Just because a pregnant woman may have the right to choose an abortion does not mean that she has a right to have the government pay for it.

Because in these cases the Court found no suspect classification and no impingement upon the exercise of a fundamental right, it applied the rational basis standard of scrutiny, i.e., whether the legislation is rationally related to a legitimate governmental interest. On this point, even the *Roe* Court acknowledged that the state has an "important and legitimate interest . . . in protecting the potentiality of human life." 410 US 162. And in *Beal v Doe,* 432 US 446, the Court recognized a "strong and legitimate [state] interest in encouraging normal childbirth." In explaining the rational basis of a decision by government to provide funding for medically necessary services generally, but not for medically necessary abortions, the Court in *Harris* said: "Abortion is inherently different from other medical procedures, because no other pro-

line, complained that the fee was unconstitutional because it placed a greater obstacle to education in the path of the poor than in the path of wealthier families. Finding that North Dakota had neither a legal nor a practical monopoly on the means of transporting children to school, the Court rejected the argument: "The Constitution does not require that [bus] service be provided at all, and it is difficult to imagine why choosing to offer the service should entail a constitutional obligation to offer it for free." 487 US 462.

cedure involves the purposeful termination of a potential life." 448 US 325.

Finally, the Court has emphasized that no burden is imposed upon the government to remain neutral regarding abortion: "[The right recognized in *Roe*] implies no limitation on the authority of a State to make a value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds." *Maher,* 432 US 474. For these and other reasons, the Court has concluded that legislation which provides funding for medical services generally, but not for abortions, is within the limits of the Equal Protection Clause of the federal constitution.

As the Court of Appeals majority in this case candidly conceded,

> Clearly, if the issues presented were to be adjudicated under the federal constitution, whether under the Equal Protection or Due Process Clauses of the Fourteenth Amendment, or some "right of privacy" extracted from the First, Third, Fourth or Ninth Amendments, plaintiffs' challenges to the constitutional validity of [§ 109a] would be rejected. [187 Mich App 522-523.]

IV

We turn now to an examination of the reasoning employed by a majority of the Court of Appeals panel in reaching its contrary conclusion under the Michigan Constitution.

The panel's analysis begins with a declaration that "our [state] Constitution affords a right to an abortion." *Id.* at 508. Then, the panel proceeds to a conclusion, which it considers "dispositive in this case," that § 109a is violative of the Equal Protection Clause of Const 1963, art 1, § 2. *Id.* at 510.

The panel finds support for its decision in the following propositions: (1) that Michigan's Equal Protection Clause provides greater protection than the federal Equal Protection Clause, (2) that Michigan courts are free to analyze state constitutional provisions differently than federal courts analyze federal constitutional provisions, and (3) that § 109a impinges upon a fundamental right under the Michigan Constitution, which triggers strict scrutiny.[25]

In due course, we shall examine, in turn, each of these propositions. First, however, we pause to comment briefly on the assertion that our state constitution includes the right to an abortion.

A

In this appeal, plaintiffs and supporting amici curiae have argued that a state constitutional abortion right should be inferred from previous decisions of this Court and of the Court of Appeals. For example, they rely on *Advisory Opinion on Constitutionality of 1975 PA 227,* 396 Mich 465, 504-505; 242 NW2d 3 (1976), wherein it was said,

> This Court has long recognized privacy to be a highly valued right. *De May v Roberts,* 46 Mich 160; 9 NW 146 (1881). No one has seriously challenged the existence of a right to privacy in the Michigan Constitution nor does anyone suggest that right to be of any less breadth than the guarantees of the United States Constitution.
>
> The United States Supreme Court has recognized the presence of constitutionally protected "zones of privacy." *Griswold v Connecticut,* 381 US 479, 484; 85 S Ct 1678; 14 L Ed 2d 510 (1965); *Roe*

---

[25] The panel also asserts that the state is without a compelling interest to satisfy strict scrutiny. Although we do not here focus separately on this point, it will be discussed in the analysis which follows.

*v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973). These zones have been described as being within "penumbras" emanating from specific constitutional guarantees. Often mentioned as a basis of the right to privacy are the 1st, 3rd, 4th, 5th, 9th and 14th Amendments to the United States Constitution. The people of this state have adopted corresponding provisions in art 1 of our Constitution.

Plaintiffs also find support for a state constitutional right to abortion in the Court of Appeals decision in *People v Nixon,* 42 Mich App 332; 201 NW2d 635 (1972), remanded 389 Mich 809 (1973), *On Remand,* 50 Mich App 38; 212 NW2d 797 (1973). In *Nixon,* the Court determined that because Michigan's criminal abortion statute[26] was enacted to protect pregnant women from unsafe abortions, the statute became obsolete as advances in medical technology increased the safety of abortion for pregnant women.

On the other hand, defendants respond that the conclusions drawn by the Court of Appeals in *Nixon* were dicta and have not been adopted by this Court. Indeed, defendants argue that a subsequent decision of this Court, *People v Bricker, supra,* overruled *Nixon* and established that no separate state right involving abortion exists. Further, defendants challenge reliance on *Advisory*

[26] MCL 750.14; MSA 28.204. The statute provides,

Any person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, shall be guilty of a felony, and in case the death of such pregnant woman be thereby produced, the offense shall be deemed manslaughter.

In any prosecution under this section, it shall not be necessary for the prosecution to prove that no such necessity existed.

*Opinion on Constitutionality of 1975 PA 227,* because that decision did not deal with abortion or any closely related subject, and because it was a decision with no precedential authority.

Whatever the merit of these and other arguments available to both sides concerning the existence of a separate state right to an abortion, we find it is unnecessary to decide that issue in this case, given our conclusion with regard to the funding question. As the discussion that follows makes clear, even if it is assumed arguendo that a state constitutional abortion right coextensive with the federal right exists, we are able to conclude that § 109a does not violate the Michigan Constitution, just as the United States Supreme Court was able to uphold the denial of public funding in *Maher* and *Harris,* without need to question the validity of *Roe.*[27]

B

To support its conclusion that § 109a is invalid, the Court of Appeals panel claims that the equal protection guarantee in our state constitution provides greater protection than the corresponding guarantee in the federal constitution. 187 Mich App 517. Specifically, the panel concludes that the Equal Protection Clause of our constitution was adopted for the purpose of "creating rights broader in scope than those afforded under its federal counterpart." 187 Mich App 516. However, a review of the jurisprudence and constitutional history of this state suggests the opposite—that our

[27] Given our reversal of the Court of Appeals decision on the dispositive funding question, and without intimating any view regarding the merits, we vacate, and direct that no precedential weight is to be accorded, the discussion and conclusion in the Court of Appeals opinion regarding the underlying issue of a state constitutional right to abortion.

Equal Protection Clause was intended to duplicate the federal clause and to offer similar protection.

The Court of Appeals panel seeks to justify its expansive reading of our equal protection guarantee by pointing to textual differences between the 1908 and 1963 Constitutions, and by referring to the debates of the Constitutional Convention which preceded adoption of the 1963 Constitution. However, we are not persuaded by these considerations.

While the 1908 Constitution was in effect, the only basis for a state guarantee of equal protection was found in a few words included in a broad statement concerning "Political Power" in art 2, § 1: "All political power is inherent in the people. Government is instituted for their *equal* benefit, security and protection." (Emphasis added.)

Despite this sparsity of words, the pre-1963 decisions of this Court ruled that equal protection rights under the state constitution were the same as under the federal constitution. See *In re Fox Estate,* 154 Mich 5; 117 NW 558 (1908), rev'd on other grounds 159 Mich 420; 124 NW 60 (1909); *Naudzius v Lahr,* 253 Mich 216, 222; 234 NW 581 (1931). Nevertheless, it is understandable that the delegates to the convention which produced the 1963 Constitution would have considered it appropriate to draft a more adequate statement to describe the equal protection rights to be secured. However, if it had been their purpose to create more or different rights than those encompassed in the federal Equal Protection Clause, surely they would not have chosen these words: "No person shall be denied the equal protection of the laws . . . ." Obviously, except for the adjustment necessary because they were drafting a state, rather than the federal, constitution, the language is essentially the same as the Equal Protection

Clause of the Fourteenth Amendment, which provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

It is true that the delegates included in art 1, § 2 a second clause relating to civil rights: "nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin." However, that a separate clause to provide explicit protection for civil rights was adopted in the midst of the civil rights movement, does not, in and of itself, suggest any purpose on the part of the delegates to broaden the scope of the preceding Equal Protection Clause.[28]

Accordingly, we do not find in the wording used, nor in its arrangement, any evidence of purpose on the part of the drafters to provide broader protection in the Equal Protection Clause of the state constitution than is found in its federal counterpart. Rather, the pattern suggests a deliberate effort to duplicate the protection secured by the federal clause. Furthermore, a careful examination of the record of the debates of the Constitutional Convention confirms this view.

We note that when the Committee on Declaration of Rights, Suffrage, and Election offered its report recommending adoption of art 1, § 2, including the Equal Protection Clause as now worded, it was accompanied by a minority report proposing substitute language.[29] The substitute focused, not on the Equal Protection Clause, but on the separate Civil Rights Clause. The amendments which

[28] Moreover, in its opinion the Court of Appeals majority makes clear that its decision rests solely on the Equal Protection Clause of Const 1963, art 1, § 2, and not on the succeeding Civil Rights Clause. 187 Mich App 534-535.

[29] 1 Official Record, Constitutional Convention 1961, pp 740-741.

would have expanded coverage of that clause were rejected, and the committee's proposal was then adopted and ultimately became Const 1963, art 1, § 2.

To support its assertion that the framers of our constitution intended to provide broader equal protection rights than those secured by the federal constitution, the Court of Appeals majority makes only two references to the proceedings of the Constitutional Convention. First, it notes that the "convention comment to Const 1963, art 1, § 2 clearly stated, 'This is a new section.'" 187 Mich App 515. Second, it calls attention to a statement by the chairman of the Committee on Declaration of Rights, Suffrage, and Elections:

> "[T]here has been a distinct trend in recent State Constitutions to incorporate equal protection or civil rights clauses *to apply to all persons* as well as those singled out for special attention because of more apparent discrimination." [*Id.* Emphasis added by the Court of Appeals.]

It is unnecessary to take issue with either point to observe that the extent of support mustered from the convention proceedings is very thin. Furthermore, if the purpose of quoting the chairman was to suggest that the delegates intended our state's Equal Protection Clause to be broader ("all persons") than its federal counterpart, the argument misses its mark. The federal clause assures equal protection to "any person."

The portions of the convention debate that focused on equal protection do not support the analysis of the Court of Appeals majority. Rather, we draw from a reading of the convention record the firm conclusion that the delegates intended to

affirm and incorporate the basic notions of equal protection that prevailed at the time.[30]

C

In addition to concluding that our state's equal protection guarantee is broader in scope than the federal guarantee, the Court of Appeals panel claims to have rejected "the method used by the United States Supreme Court in analyzing the federal Equal Protection Clause in favor of a different analysis of Michigan's Equal Protection Clause." *Id.* at 518. The panel states:

Beyond our freedom to read our own state's Equal Protection Clause more broadly than that of the United States Constitution, we are also free to reject the method used by the United States Supreme Court in analyzing the federal Equal Protection Clause in favor of a different analysis of Michigan's Equal Protection Clause. See [*City of Mesquite v*] *Aladdin's Castle, Inc,* 455 US [283] 293 [102 S Ct 1070; 71 L Ed 2d 152 (1982)]. [*Id.*][31]

[30] This conclusion is supported by earlier decisions of this Court and of the Court of Appeals. See, e.g., *Moore v Spangler,* 401 Mich 360, 370; 258 NW2d 34 (1977); *Fox v Employment Security Comm,* n 18 *supra* at 588; *Roy v Rau Tavern, Inc,* 167 Mich App 664, 667; 423 NW2d 54 (1988); *Doster v Estes,* 126 Mich App 497, 512; 337 NW2d 549 (1983); cf. *NAACP v Dearborn,* 173 Mich App 602, 613-614; 434 NW2d 444 (1988).

[31] It is true, as the Court of Appeals majority has stated, that " '[t]he United States Supreme Court does not have a monopoly on correct constitutional interpretation.' " 187 Mich App 518 (citation omitted). Of course, this Court has the authority to determine that a provision in our state constitution should be interpreted or applied differently than a parallel provision in the federal constitution. *City of Mesquite v Aladdin's Castle, Inc, supra* at 293; *People v Thompson,* 424 Mich 118, 125; 379 NW2d 49 (1985); *Delta Charter Twp v Dinolfo,* 419 Mich 253; 351 NW2d 831 (1984). However, in certain cases where textual similarities and historical considerations have pointed to a common meaning, this Court has seen fit to adopt a construction given by the United States Supreme Court to a parallel provision in the federal constitution in the absence of compelling reason to impose a different interpretation. See, e.g., *People v Nash,* 418 Mich 196; 341

Despite this assertion, the Court of Appeals actually accepts the basic framework for equal protection analysis as developed by the United States Supreme Court:

> As the United States Supreme Court has acknowledged, and we find equally true under our state constitution, the Equal Protection Clause, like the Due Process Clause, "is not susceptible of exact delimitation. No definite rule in respect of either, which automatically will solve the question in specific instances, can be formulated." Although the "equal protection" provision of our constitution is not a clause with precise definition, we recognize it can be violated by legislation that either affects a fundamental interest, as in this case, or creates a suspect classification, and that cannot be justified by any compelling interest of the state. In a case that does not involve a fundamental interest or a suspect class, a determination whether the legislation violates the Equal Protection Clause is made under the rational basis test, which requires that the party challenging the statute show it is without reasonable justification. [187 Mich App 510-511. Citations omitted.]

There is no suggestion by the panel that equal protection claims should not be reviewed using this framework, nor is any alternative framework proposed.

Moreover, even though it claims that it is employing a method of equal protection analysis distinct from that used by the United States Supreme Court, the panel scrutinizes § 109a under Michigan's Equal Protection Clause just as the Supreme Court scrutinized abortion funding restrictions under the federal Equal Protection Clause. Because § 109a is alleged to create a classification scheme

NW2d 439 (1983); *People v Catania,* 427 Mich 447; 398 NW2d 343 (1986); *People v Collins,* 438 Mich 8; 475 NW2d 684 (1991).

that treats some indigent women differently than others, the panel first determines the appropriate level of judicial scrutiny to apply. To determine if strict scrutiny is to be applied, the panel inquires whether § 109a impinges upon the exercise of a fundamental right.[32] Again, the panel follows the Supreme Court; it analyzes the effect of § 109a on the "right to procreative choice." *Id.* at 523.

It is in analyzing the effect of a funding restriction on the right of procreative choice that the Court of Appeals majority disagrees with the United States Supreme Court. In contrast to that Court, the panel concludes that § 109a does impinge upon the exercise of the right to choose an abortion:

> [I]f [a Medicaid-qualified pregnant] woman chooses to have an abortion, even where medically necessary or required to terminate a pregnancy resulting from rape or incest, § 109a directly prevents the state from providing funds for that care. It is the woman's exercise of one fundamental right—the right to an abortion—which triggers § 109a's restrictions. Her right to bear the child is not similarly impinged upon.
>
> We recognize that, while the woman's indigency also acts as a barrier to her freedom of choice, the state is not required to remedy that condition. But the state itself, by adoption of § 109a, has created a direct barrier to the woman's exercise of her right to an abortion.
>
> There is thus an inequality within the program, with the distinction based on an indigent pregnant woman's exercise of an option which the constitution vouchsafes to her individually. If she exercises her constitutional right to abortion, she is excluded from a program for which she is otherwise qualified; if she elects not to exercise that constitu-

---

[32] The panel does not suggest that § 109a creates a suspect class, which also would trigger strict scrutiny.

tional option, she may continue to receive the benefits of this statutory program. [*Id.* at 524.]

Having determined that § 109a does impinge upon the exercise of a fundamental right under the Michigan Constitution, the panel then applies strict scrutiny. Predictably, it concludes that § 109a cannot meet this demanding level of review and strikes down the section.

Obviously, the critical element in the panel's analysis is not its purported rejection of basic equal protection analysis as developed by the United States Supreme Court, but its conclusion that § 109a impinges upon the right to choose an abortion. We agree with the panel that the Equal Protection Clause would require strict scrutiny of § 109a if the section were to impinge upon the exercise of a fundamental right. Thus, we turn to the question whether § 109a impinges upon the exercise of a fundamental right in the Michigan Constitution.

D

The Court of Appeals majority concludes that § 109a directly interferes with the exercise of a woman's right to choose an abortion. 187 Mich App 524. It appears that the basis of this conclusion is an assumption that Medicaid-qualified women have an entitlement to funds for an abortion. Although the panel does not actually state that such an entitlement exists, it at least suggests such an entitlement when it compares the situation of Medicaid-qualified women before and after adoption of § 109a. The panel notes that "[b]efore the enactment of § 109a, all Michigan women, rich and poor alike, were able to exercise [their right of procreative choice]." *Id.* at 523. However, the panel

continues, after the enactment of § 109a, benefits once offered are taken away so "the state itself, by adoption of § 109a, has created a direct barrier to the woman's exercise of her right to an abortion." *Id.* at 524. In addition, the panel asserts that when a Medicaid-qualified woman elects to have an abortion, she is "excluded from a program for which she is otherwise qualified . . . ." *Id.* We disagree.

In the absence of some burden on the government to provide funds for the exercise of a right, a decision by the Legislature not to fund the exercise of a right is distinct from a legislative action that impinges upon that right. *Regan v Taxation with Representation,* 461 US 549. Likewise, even where the state has previously funded the exercise of a right, it is not required to continue such funding. See *Atkins v Parker,* 472 US 115; 105 S Ct 2520; 86 L Ed 2d 81 (1985). For public policy reasons, the state may choose to eliminate benefits that it previously offered.[33] Thus, when the state offers a particular benefit to persons receiving public assistance, it retains the "power to substitute a different, less valuable entitlement at a later date. . . . '[A] welfare recipient is not deprived of due process when the legislature adjusts benefit levels.' " *Atkins,* 472 US 129-130. See also *Saxon v Dep't of Social Services,* 191 Mich App 689; 479 NW2d 361 (1991), lv den 439 Mich 884 (1991).

Clearly, the right involved in this case is not a right to continue to receive funds that were offered in the past; rather, it is the right to choose an abortion without unduly burdensome government interference. Like the United States Supreme Court, we do not see how a decision to offer funds only for childbirth takes away any of the choices

[33] See, for example, *Bob Jones Univ v United States,* 461 US 574; 103 S Ct 2017; 76 L Ed 2d 157 (1983).

that would be available to an indigent woman if the state did not offer funds for childbirth. It may be that in the absence of state funding her indigency acts as a barrier to choosing abortion, but "[a]n indigent woman who desires an abortion suffers no disadvantage as a consequence of [Michigan's] decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires." *Maher,* 432 US 474. Similarly, an indigent woman who desires an abortion is not excluded from the Medicaid program. Whether a Medicaid-qualified woman wants to terminate her pregnancy or to carry her fetus to term, she is treated in the same way that any other Medicaid-qualified pregnant woman is treated: she is offered reimbursement for the expenses of childbirth, but not for the expenses of an abortion.

Further, we do not find that an offer to fund childbirth impermissibly influences the procreative decisions of an indigent woman. The state's election to subsidize childbirth does not coerce a woman into forfeiting her right to choose an abortion any more than the state's election to subsidize public schools coerces parents into forfeiting their right to send their children to private schools. See *Norwood v Harrison, supra.* As with the decision to fund public schools, the state may have made childbirth a more attractive option by paying for it, but it has imposed no restriction on obtaining an abortion that was not already there. *Maher,* 432 US 474.[34]

---

[34] Of course, the state's decision to subsidize childbirth cannot be characterized simply as an attempt to encourage women to choose childbirth instead of abortion. As Professor McConnell explains in his article, *The selective funding problem: Abortions and religious schools,* 104 Harv L R 989, 1011-1012 (1991):

    [T]he medical services involved in childbirth serve a function beyond "terminating pregnancy" and improving the mother's

For these reasons, we disagree with the Court of Appeals and conclude that the state's decision to fund childbirth, but not abortion, does not impinge upon the exercise of a fundamental right provided by the Michigan Constitution.

V

Having determined that § 109a does not impinge upon the exercise of a fundamental right, we hold that the Court of Appeals erred when it subjected § 109a to strict scrutiny. Because § 109a does not impinge upon the exercise of a fundamental right, and because, at least with respect to the funding of abortions, our equal protection guarantee does not offer greater protection than the federal equal protection guarantee, the proper standard of review is the rational basis test as articulated earlier.

Like the United States Supreme Court, we conclude that § 109a is rationally related to a legitimate governmental purpose. Contrary to the suggestion of the Court of Appeals,[35] there is no constitutional obligation on the state to remain neutral regarding abortion any more than there is an obligation on the state to remain neutral regarding the exercise of other fundamental rights. The state has a legitimate interest in protecting potential life, and it has a legitimate interest in promoting childbirth. Equally important, the Legislature has a legitimate interest in allocating

health. They are more than just a substitute for abortion; they are also a means of caring for a child. While the appropriate way to deal with pregnancy is a controverted issue, everyone agrees that if a child is to be born, the birth should be completed as safely as possible. Medical services at birth should be understood as part of a network of government-funded social services for the benefit of children . . . .

[35] 187 Mich App 531.

state benefits in a way that reflects its determination of the public policy of the state. Our constitution does not require that we have a government without values; it requires only that, in the pursuit of certain values, our government will not improperly interfere with the exercise of fundamental rights. Because no medical procedure besides abortion involves the deliberate termination of fetal life, and because of the high cost of childbirth and the relatively lower cost of abortion, it is rational for the state to pursue its legitimate interests by paying for childbirth, but not abortion.

In reaching this decision, we are cognizant of plaintiffs' argument that "[t]he sentiment of the legislature, or, in fact, of the electorate, with regard to a given issue does not change the role of the judiciary." Similarly, we agree with the Court of Appeals that "[t]he legislative power of the people, through the initiative and referendum, does not give any more force or effect to voter-approved legislation than to other legislative acts . . . ." 187 Mich App 527. Just as important, however, is the principle that the limits of legislative power are defined by our federal and state constitutions, not by the sentiment of the judiciary. *Marbury v Madison,* 5 US (1 Cranch) 137; 2 L Ed 60 (1803). Thus, as we previously have observed, "[t]hat the legislative solution appears undesirable, unfair, unjust or inhumane does not of itself empower a court to override the legislature and substitute its own solution." *Manistee Bank & Trust Co,* 394 Mich 666-667. Whatever the circumstances surrounding the adoption of § 109a, we are unable to find any basis in the history or text of our constitution that would support the conclusion of the Court of Appeals.

For these reasons, we hold that the Equal Pro-

tection Clause of our constitution permits the state to fund the expenses of childbirth even though the state does not fund abortions.[36] The decision of the Court of Appeals is reversed.

CAVANAGH, C.J., and LEVIN, BRICKLEY, and RILEY, JJ., concurred with GRIFFIN, J.

LEVIN, J. (*concurring*). Jane and Nancy Doe concede, for the purposes of this lawsuit, that 1987 PA 59, adding § 109a of the Social Welfare Act,[1] insofar as it proscribes the use of public funds to pay for an elective abortion, is in the main constitutional—possibly ninety to ninety-nine percent constitutional.

Doe and her amici curiae supporters claim that § 109a is nevertheless unconstitutional insofar as it proscribes the use of public funds to provide a "medically indicated" abortion for an indigent woman.

## A

While there is evidence that pregnancy represents for some women a serious and long-term threat to their health unless they have an abortion, and thus that an abortion is medically indicated for such women, the record is silent concerning the number of indigent women that might

---

[36] Because the Court of Appeals found that § 109a violated the Equal Protection Clause, it did not address the other constitutional arguments advanced by plaintiffs. Plaintiffs have not renewed their other constitutional claims before this Court; however, we conclude that those claims would not affect our decision today. We review due process claims using substantially the same standards as we use to review equal protection claims. *Shavers v Attorney General,* 402 Mich 612-613. Further, our analysis under the Equal Protection Clause incorporates the claim that a woman's privacy right is violated by § 109a.

[1] MCL 400.1 *et seq.*; MSA 16.401 *et seq.*

justifiably seek a medically indicated abortion as distinguished from an elective abortion.

In ordinary litigation, when the record is silent, a court attributes the failure of proof to one of the parties and enters judgment accordingly, or, on occasion, remands the case for the taking of additional evidence. If this were an ordinary case, however, it would have been dismissed as moot when Doe obtained an abortion. This is not ordinary litigation.

The parties, having failed to provide evidence concerning the number of women that might justifiably seek a medically indicated abortion, as distinguished from an elective abortion, it is, I think, appropriate, in order to put the issue presented in perspective, to attempt to determine what is truly at stake for indigent women *for whom an abortion is medically indicated.*

B

The Department of Social Services projected that in fiscal year 1990,[2] eighty percent (15,200) of the estimated 19,000 women who, before the enactment of § 109a would have been eligible for a Medicaid-funded abortion, would, although public funding had been withdrawn, nevertheless obtain an abortion—as did Doe after this lawsuit was commenced.

---

[2] The projection is set forth in an exhibit introduced during the testimony of the Director of the DSS who said that the department estimated that the enactment of § 109a would have the following program effect:

In FY 1990, termination of Medicaid abortion coverage will result in:
20% of the 19,000 Medicaid abortions will be carried to term.
An additional 3,800 Medicaid deliveries.
1,000 additional AFDC cases.

If having a baby posed a serious and long-term threat to the health of as many as 1,900 (ten percent of the 19,000) indigent pregnant women a year, the amount required to pay for abortions, at the DSS payment rate of $318, would approximate $600,000 annually.[3]

A survey that sought to determine why women have abortions indicates that fewer than ten percent of the women who chose to have an abortion did so because having a baby posed a serious and long-term threat to their health. The survey reports that seven percent responded that concern for their "own health" contributed to their decision to have an abortion, but only "53 percent of those having an abortion because of a health problem said that a doctor had told them that their condition would be made worse by being pregnant."[4] It therefore appears that an abortion may be medically indicated for less than four percent of the 19,000, or less than 800 indigent pregnant women a year, and that, consequently, the amount involved is less than $300,000 annually.

It appears[5] that private funds or donated services approaching $4,000,000 a year may be available to pay for elective and medically indicated

[3] If ten percent is too high, the amount involved may be closer to $200,000 or $300,000. On the other hand, if having a baby poses a serious long-term health risk to as many as fifteen or twenty percent of women who become pregnant, the amount involved might be closer to $1,000,000.

[4] Torres & Forrest, *Why do women have abortions?* 20 Family Planning Perspectives, No. 4 (July/Aug 1988), pp 169 ff. This study was done under the auspices of the Alan Guttmacher Institute and was conducted in 1987. I have been advised that this is the latest survey available.

[5] On the basis of the DSS payment rate of $318 an abortion, and the DSS's projection that eighty percent of the 19,000 women—who before § 109a became law would have qualified for a Medicaid abortion—would obtain an abortion in FY 1990 with privately provided funds or donated services.

abortions for indigent women. This should be sufficient to provide an abortion to all indigent women for whom an abortion is medically indicated[6]—whether the amount required is $300,000 a year or as much as $1,000,000 a year. I conclude therefore that there is a substantial question whether women *for whom an abortion is medically indicated* are in fact—having in mind available sources of funding alternative to government funding—medically indigent.

It also appears that there are many practical obstacles facing a woman in obtaining an elective or medically indicated abortion.[7] Obtaining funds

[6] Absent evidence that private funding sources are devoted in the main to pay for elective abortions, one would suppose that such funds are at least as available for a medically indicated abortion as for an elective abortion.

In light of the stress placed by Doe and her amici curiae supporters on the plight of a woman faced with a long-term threat to her health for whom an abortion is medically indicated, one would think that if there is a need to prioritize resources, a woman for whom an abortion is medically indicated would have some priority.

[7]    At this moment, abortion is not available in 83% of America's counties, home to nearly a third of American women of childbearing age. For reasons of professional pride, or fear, or economic pressure, doctors have backed away from the procedure even where it remains available.

. . . America is entering new moral and political territory, rough and uncharted, but lit by the phosphor of righteous certainties. And as the combatants square off with their irreconcilable notions of life and liberty, the middle ground, what there is of it, promises to become scorched earth.

\* \* \*

The predicament of women trying to get abortions is harder to distill into a single wrenching image. There are 1.6 million abortions carried out in the U.S. each year, representing almost a fourth of all pregnancies. It is estimated that more than 46% of American women will have had one by the time they are 45. But while there are about 2,500 places around the country that provide abortions—down from a high of 2,908 ten years ago—they are mostly clustered around cities, leaving broad areas of the country unserved. A single clinic serves 24 counties in northern Minnesota. Just one doctor provides abortions in South Dakota. [Lacayo, *No matter what happens to* Roe v Wade, *the doctors who perform abortions and their patients*

to pay for an abortion may be the least of the obstacles, or, in reality, no substantial obstacle for the relatively few indigent women for whom an abortion is medically indicated.

C

If there were a clearly established constitutional right to a publicly funded abortion, it would, of course, be of no moment that an abortion is obtainable from private charitable sources. The asserted entitlement, however, is, on the contrary, without any well-established support in the precedents.[8]

This Court is truly being asked to break new ground by providing a judicial remedy to rectify a legislative decision to withdraw funding for a component (medical service for an abortion) of a larger program (general medical service under Medicaid). Doe and amici curiae assert this is justified because the alternatives facing indigent women denied public funds to pay for a medically indicated abortion are so dire that this Court, to avoid the injustice that the Equal Protection Clause was designed to avoid, must intervene and hold to be invidiously discriminatory the challenged classification of indigent pregnant women between those for whom medical service will be fully provided if they carry a baby to term and those in need of medical service for a medically indicated abortion.

---

*face formidable obstacles,* Time Magazine, May 4, 1992, pp 27, 28.]

[8] The dissenters rely (see ns 11-13 and accompanying text) on case law holding that the Equal Protection Clause protects against discrimination in establishing *eligibility criteria* for a program that the Legislature has chosen to fund. Those cases do not support a claim that the Equal Protection Clause requires the Legislature to fund a program because it has funded another program or components of such a program.

Since Doe and amici curiae place such stress on the plight of an indigent woman in desperate need of a medically indicated abortion, and the dissenters place such stress on the burden of Doe's right to an abortion represented by the denial of funding, the availability of private funding and donated services is, I believe, a relevant consideration in deciding whether judicial intervention is warranted.

It not having been established that indigent women do not have access to private funding or donated services even for a medically indicated abortion, I am unpersuaded that this Court can properly be asked to attempt to articulate a principled basis—I have attempted to do so without success—for distinguishing the plight of an indigent woman for whom an abortion is medically indicated from the plight of a man or woman, formerly on general welfare assistance, who has been evicted from shelter in the winter, without the means of acquiring adequate shelter or food, put at risk of freezing or starving to death and physical assault on the streets, and entirely dependent on private charity because unable to obtain employment.[9]

I

The Due Process Clause secures to a woman reproductive freedom during at least the first trimester of a pregnancy, and may also secure to her such a liberty interest to obtain, without governmental interference, a medically indicated abor-

---

[9] See *Saxon v Dep't of Social Services,* 191 Mich App 689; 479 NW2d 361 (1991), lv den 439 Mich 880 (1991), declining to provide injunctive relief in a case challenging the elimination of the General Assistance and Job Start programs. The challenge did not indeed include a claim that the elimination of these programs was violative of the Equal Protection Clause.

tion beyond the first trimester of a pregnancy. This right has been described as a fundamental right.

It is *not* contended, however, that a woman has a fundamental right to a governmentally funded abortion. It is claimed rather that because the federal and state governments appropriate large sums to provide medical care through the Medicaid program for indigent persons, such as Doe, the failure to provide funds to pay for medically indicated abortions is violative of the Equal Protection Clause. It is contended that while the Legislature is not obliged to provide medical care for indigent persons, that having established the Medicaid program, which includes prenatal and gynecological medical care for indigent women, it cannot discriminate, consistent with the Equal Protection Clause, against indigent women who desire to exercise their fundamental right to have an abortion by denying them, in contradistinction from indigent men and women generally, and pregnant women in particular, medical care requisite to obtaining a medically indicated abortion.

The question presented is thus whether the Equal Protection Clause requires the Legislature to provide funds to pay for a medically indicated abortion for an indigent woman because the Legislature has funded a program of comprehensive medical care for indigent men and women.

A

I have signed the opinion of the Court, and join in reversal of the Court of Appeals because there is no precedent for construing the Equal Protection Clause as empowering the judiciary to require

legislative funding of a program,[10] or component of a comprehensive program excepting only state court decisions[11] that, in the context of the Medicaid abortion controversy, read the Equal Protection Clause to so require. The argument predicated on those state court decisions begs the question presented; clearly this Court cannot legitimately decide that the Equal Protection Clause so requires in this context simply because other state courts have so required.[12]

B

The decisions of the United States Supreme Court relied on in one of the two dissenting opinions[13] concern the constitutionality of eligibility criteria for programs that the Congress had chosen to fund. The Court, in those cases, held that durational residency[14] and availability-for-work-on-the-

---

[10] The United States Supreme Court has required public funding of counsel for indigent defendants in criminal cases under the Sixth Amendment, *Gideon v Wainwright,* 372 US 335; 83 S Ct 792; 9 L Ed 2d 799 (1963), and this Court has required public funding of counsel for indigent parents where the state moves against them to terminate parental rights. *Reist v Bay Circuit Judge,* 396 Mich 326; 241 NW2d 55 (1976). The state is not moving against indigent women who seek an abortion.

[11] *Right to Choose v Byrne,* 91 NJ 287; 450 A2d 925 (1982); *Doe v Maher,* 40 Conn Supp 394; 515 A2d 134 (1986); *Moe v Secretary of Administration & Finance,* 382 Mass 629; 417 NE2d 387 (1981); *Committee to Defend Reproductive Rights v Myers,* 29 Cal 3d 252; 625 P2d 779 (1981).

[12] No precedent is cited in these decisions supportive of a claim that the Equal Protection Clause requires the government to fund a program or a component of a comprehensive program.

[13] BOYLE, J., *post,* p 710, citing *Sherbert v Verner,* 374 US 398; 82 S Ct 1790; 10 L Ed 2d 965 (1963); *Shapiro v Thompson,* 394 US 618; 89 S Ct 1322; 22 L Ed 2d 600 (1969). *Sherbert* and *Shapiro,* together with *Memorial Hosp v Maricopa Co,* 415 US 250; 94 S Ct 1076; 39 L Ed 2d 306 (1974), were discussed in the opinion of the Court in *Harris v McRae,* 448 US 297, 317, n 19; 100 S Ct 2671; 65 L Ed 2d 784 (1980), reh den 448 US 917 (1980).

[14] *Memorial Hosp v Maricopa Co* and *Shapiro v Thompson, supra.*

Sabbath[15] eligibility criteria for entitlement to governmental benefits were invalid as violative of the constitutional rights, for one group of cases to travel, and in another to observe one's religious beliefs.

Those decisions would be in point if § 109a sought to penalize indigent women who have an abortion by denying them access to medical benefits or other welfare benefits.[16] As stated by the United States Supreme Court in *Harris v McRae,* 448 US 297, 317, n 19; 100 S Ct 267; 65 L Ed 2d 784 (1980), reh den 448 US 917 (1980): "A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion."[17]

---

[15] *Sherbert v Verner, supra.*

[16] The other dissenting opinion argues that MCL 400.40-400.43; MSA 16.440-16.443 would require an indigent woman to report the receipt of private funding for an abortion, and that

[i]f an indigent woman received funds from an outside source to finance an abortion, her total monthly welfare benefits could be proportionately reduced. *Id.* Because payments are made directly to the provider and no cash allowance is given for medical assistance, she is not even given the choice of waiving other medical necessities in favor of a medically indicated abortion. Consequently, a woman who chooses to have the abortion must forgo housing or care for her family if she wants this medical treatment. [MALLETT, J., *post*, p 702.]

As set forth in *Harris v McRae, supra* at 317, n 19, a "substantial constitutional question would arise" if the Department of Social Services were to seek to reduce an indigent woman's welfare benefits because she had an abortion without regard to whether she or someone else paid for the abortion or the medical services were provided without charge.

The invalidity of penalizing an indigent woman for exercise of her constitutional right to have an abortion does not and would not mean that the government must pay for the abortion; the remedy would be to declare the penalty, reduction of welfare benefits, to be invalid.

[17] The Court continued that this would be analogous to *Sherbert v Verner:*

Those decisions are not, however, in point because § 109a does not penalize an indigent woman who has an abortion by denying her access either to medical or other welfare benefits. An indigent woman who has had an abortion is entitled to all the medical benefits that any other indigent man or woman might claim, including, it would appear, any medical care that might be required in consequence of her having had an abortion.[18]

Case law holding that even though the Congress or the Legislature may not be constitutionally required to provide funds for a particular program, when it chooses to do so the eligibility criteria must be consistent with other constitutional limitations, does not support the claim that the Legislature may not eliminate a component of a larger program, or that it must provide funds for a component of a larger program.

Section 109a does not establish an unconstitutional eligibility criterion. It does not deny to any woman access to medical benefits that other persons are entitled to receive. Rather, § 109a provides that a particular benefit, funding of abortions, is no longer to be provided. There is no eligibility criterion by which any woman can obtain a publicly funded abortion. This is not like the cases cited in the dissenting opinion, where the Congress had funded a program, but sought, or a state legislature had sought, to deny some persons access to the program who otherwise would be

where this Court held that a State may not, consistent with the First and Fourteenth Amendments, withhold all unemployment compensation benefits from a claimant who would otherwise be eligible for such benefits but for the fact that she is unwilling to work one day per week on her Sabbath.

[18] There is no suggestion on this record that a woman who suffered medical complications as a result of an abortion would be denied whatever medical care she might require.

eligible to participate in the program by the establishment of eligibility criteria that the court found to be violative of a constitutional limitation.

C

Nor does Act 59 ordain an unconstitutional gender-based classification. It is simply a truism that only women can become pregnant, and, thus, only women can seek or obtain an abortion. Similarly, while women are now eligible for military service, only men have been subject to the draft.[19]

There is no constitutional principle that makes or constitutes all legislation that affects only one sex suspect, especially legislation concerning a subject matter that, by the laws of nature, can only affect one sex.

II

Were this Court to rule that funding of a comprehensive program of welfare assistance disables the Legislature from eliminating a component of that program where (i) the legislative motivation is based in some part on a moral judgment, and (ii) eliminating funding seriously burdens exercise by indigent persons of a fundamental right, lawyers would have a basis for asserting a new cause of action in behalf of candidates for welfare assistance generally.

The rights to shelter and food are at least as fundamental as the right to medical services for a medically indicated abortion. The Due Process Clause protects the right to seek shelter and food from unreasonable governmental interference, at

[19] Men who were drafted into service or their families might argue that the draft "legally reinforc[es] the 'special vulnerability of [men],' even at the risk of their health [or life]." BOYLE, J., *post,* p 710.

least to the same extent that it protects the right to seek reasonable medical assistance. But the Due Process Clause, no more so for the fundamental rights to shelter and food than the fundamental right to seek medical service, does not oblige government to relieve the burdens of poverty. While one may have a fundamental right to shelter, food, and medical service free of unreasonable governmental restrictions, one does not have the right to demand that government provide free shelter, free food, or free medical services.

The modern welfare state does, indeed, provide such services for many in the indigent population. But the allocation of such services has never been thought to be justiciable. To be sure, if the government decides to establish a program for the benefit of poor persons, it may not establish eligibility criteria violative of constitutional limitations on the power of government. But the Equal Protection Clause has not been thought to endow the judiciary with the power to supervise the allocation of public funds or to require that neutral principles be announced, to be enforced by the judiciary, to assure that the government governs fairly.

III

The legislative decision to provide funds for the medical expenses of childbirth does not impermissibly burden the right to choose abortion. Otherwise a great many federal and state actions would be subject to constitutional challenge. Both the state and federal governments have enacted laws and programs designed to aid the institution of marriage. The Internal Revenue Code provides benefits to married persons. The state has passed laws against adultery and bigamy. Marriage gives

one spouse legal rights in the property of the other.

There is also a right to choose not to marry, which is as equally fundamental as the right to marry. But the state provides no benefits, no entitlements, to facilitate the exercise of that choice. And no one can truthfully contend that the state unconstitutionally burdens the right not to marry by promoting the competing value, marriage.

But if the state chooses to alleviate the effects of poverty on pregnant women by funding medical care for childbirth, how can it not fund medical care for the alternative to childbirth, abortion? Should not the state respect both of these competing values equally?

Perhaps an enlightened state would choose to do so. The constitution does not, however, require the state to govern wisely or even fairly. And though it may be unfair for the state to take sides on an issue about which so many people feel so strongly, it is not unlawful for the state to do so. The government may *not* interfere with or prohibit the right to choose abortion; it need not support it with public funds even though it does support with public funds the competing value of childbirth.

One of the purposes for which a people institutes government is to express value choices, to develop societal norms, about the way in which people *should* exercise their freedom. The act of governing requires those who govern to make value choices.

Indeed, the entire concept of government neutrality on the abortion/childbirth issue is fallacious. The government must embrace one position or another. It is at least fair argument to say that the government would promote abortion by providing funding even for a medically indicated abortion. Such funding would offend those who oppose

abortion as much as the contrary result offends those who favor choice. In short, there is no middle ground. The decision to promote "choice" is as much an expression of values as the decision to promote childbirth.

Even it if were possible for the state to maintain neutrality with respect to fundamental rights, such neutrality would not result in sound governance. Indeed, the logical result would be no governance at all. Nearly every state and federal program would be subject to challenge. It will always be possible to argue that an entitlement created by the state promotes one bundle of fundamental rights at the expense of another. A requirement of neutrality would mean that the government could create no entitlement without also creating an equal and opposite entitlement. Under such a scheme of government, the role of the judiciary would be to police neutrality in legislation, steadfastly striking down any legislation that expressed an idea, contained a thought, or took a position on the issues that matter most. Only legislation consisting of dull gray matter would survive.

IV

The government must express some set of values if it is to govern at all. How then in a democracy are the values of the government to be identified and articulated, and what is the proper role of the judiciary with respect to those value choices? In most cases, such value choices must be made by the overtly political branches of government, the legislative and executive, and not the judicial branch.

In coöperation with the federal government, Michigan provides a set of medical benefits to the

indigent population. Presumably, these medical benefits will go only to those indigent persons whose medical condition warrants. Because the resources of the federal and Michigan governments are not limitless, choices must be made concerning the extent and level of benefits provided by the program. The decision to include one benefit while excluding another necessarily reflects some value choice. Perhaps the value will be economic utility. But ideas of economic utility, at least in the absence of a market, are notoriously subjective. Somebody has to decide whether we are better off paying for heart transplants for all who need them but cannot pay or spending resources on inoculations for indigent school children. Either choice would be defensible. Neither can be made without reference to some system of human values.

It is not the role of the judiciary to decide the values that properly may be taken into account in making such choices. Because what is involved is the identification and articulation of societal norms, the task should be left largely to the representative branches of government.

The judicial branch depends for the enforcement of its judgments upon the will of the executive and legislative branches and ultimately upon the will and confidence of the citizenry. That confidence is eroded when the judiciary is perceived to be acting politically by substituting the political judgment of the majority of the Court for the political judgment of the majority of the people as expressed at the election booth. Judicial power is most forcefully asserted when a court refrains from arrogating to itself decisions properly entrusted to the other branches of government or to the people.

It may be unfair to deprive only indigent women of the funds to terminate pregnancy, particularly

when it is precisely such women who are likely to need medical care for pregnancy termination most urgently to preserve their physical well-being or, at least, to preserve their opportunity to decide for themselves the course of their lives. But the people of Michigan and the Legislature have decided otherwise, and I do not find a basis in the Michigan Constitution to reverse that result. I therefore concur in the judgment of the Court holding that § 109a does not violate the Equal Protection Clause.

MALLETT, J. (*dissenting*). Under § 109a of the Social Welfare Act,[1] an indigent woman will receive no reimbursement for medical expenses if she chooses to have a medically indicated abortion. The majority concludes that § 109a does not exceed the limits of the equal protection guarantee of the Michigan Constitution. I respectfully dissent.

I

The plaintiffs Jane and Nancy Doe argue that § 109a violates the Equal Protection Clause of the Michigan Constitution by creating an intolerable classificatory scheme. I agree. Indigent pregnant women requiring medical care for childbirth may receive Medicaid benefits. However, indigent pregnant women who seek an abortion, even when medically necessary to preserve their health, are denied reimbursement through Medicaid unless the abortion is necessary to save their lives. 187 Mich App 493, 523; 468 NW2d 862 (1991). I find that § 109a is an unduly burdensome interference with a woman's fundamental right to privacy that includes the right to choose to terminate her

[1] MCL 400.1 *et seq.*; MSA 16.401 *et seq.*

pregnancy. See *Roe v Wade,* 410 US 113; 93 S Ct 705; 35 L Ed 2d 147 (1973), reh den 410 US 959 (1973).

Relying almost exclusively on United States Supreme Court decisions, the majority concludes that Michigan's denial of Medicaid funding for indigent pregnant women who seek a medically indicated abortion that is not required to save their lives does not impinge upon their fundamental right to privacy. *Beal v Doe,* 432 US 438; 97 S Ct 2366; 53 L Ed 2d 464 (1977); *Maher v Roe,* 432 US 464; 97 S Ct 2376; 53 L Ed 2d 484 (1977); *Harris v McRae,* 448 US 297; 100 S Ct 2671; 65 L Ed 2d 784 (1980), reh den 448 US 917 (1980); *Regan v Taxation with Representation,* 461 US 540; 103 S Ct 1997; 76 L Ed 2d 129 (1983). I find the United States Supreme Court analysis in these decisions flawed, and, thus, the majority's reliance on these cases misplaced. Judicial review of § 109a under the "rationality" analysis is equally defective.

This Court is hardly precluded from independently interpreting Michigan's Equal Protection Clause and may reject United States Supreme Court analysis. *City of Mesquite v Aladdin's Castle, Inc,* 455 US 283, 293; 102 S Ct 1070; 71 L Ed 2d 152 (1982) (a state court is entirely free to read its own constitution more broadly than this Court reads the federal constitution, or to reject the mode of analysis used by this Court in favor of a different analysis of its corresponding constitutional guaranty). Moreover, Michigan courts have rejected United States Supreme Court analysis on previous occasions. See *People v Jackson,* 391 Mich 323; 217 NW2d 22 (1974) (extended rights of defendants to be represented by counsel at corporeal or photographic identification procedures independent of federal constitutional ruling); *People v*

*Sundling,* 153 Mich App 277; 395 NW2d 308 (1986) (rejected adoption of "good faith" exception to the exclusionary rule where search is improper).

In concluding that § 109a is unconstitutional, I need not find that Michigan's Equal Protection Clause offers greater protection than its federal counterpart.[2] Nor do I need to conclude that a woman's fundamental right to privacy is broader under Michigan's Constitution than the federal right established in *Roe v Wade.* Section 109a impinges upon the fundamental privacy right of an indigent woman who chooses abortion as a medical treatment for her pregnancy and, therefore, is unconstitutional.

The plaintiffs do not contend that the right to choose a medically indicated abortion includes a right that the government pay for it. *Ante,* p 666. The majority's assertion in this regard goes beyond the scope of the case before this Court. As Justice Brennan clarifies in *Harris, supra, Roe* does not stand for the proposition that "the State is under an affirmative obligation to ensure access to abortions for all who may desire them." 448 US 330 (Brennan, J., dissenting.) *Roe* does require, however, that the state "refrain from wielding its enormous power and influence in a manner that might burden the pregnant woman's freedom to choose whether to have an abortion." *Id.*

Concluding that § 109a is constitutional, the majority cites *Maher, supra,* for the proposition that " '[(t)he right recognized in *Roe*] implies no limitation on the authority of a State to make a

[2] The federal constitution provides: "[no state shall] deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV, § 1. Michigan's 1963 Constitution, art 1, § 1, provides: "All political power is inherent in the people. Government is instituted for their equal benefit, security and protection." The 1963 constitution also provides: "No person shall be denied the equal protection of the laws . . . ." Const 1963, art 1, § 2.

value judgment favoring childbirth over abortion, and to implement that judgment by the allocation of public funds.'" *Ante,* p 667. The majority fails to acknowledge the fact that, notwithstanding this conclusion, the *Maher* Court held that the government cannot unduly interfere "with [a woman's] freedom to decide whether to terminate her pregnancy." 432 US 474. See also *Bellotti v Baird,* 428 US 132, 147; 96 S Ct 2857; 49 L Ed 2d 844 (1976) (a state requirement that unduly burdens the right to seek an abortion is unconstitutional).

Ruling that legislation that prohibits government-funded abortions is not unconstitutional, the United States Supreme Court has reasoned that a woman's indigency, not the government's action, makes an abortion inaccessible. See *Maher* and *Harris, supra.* The Court held:

> [A]lthough government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although [the government] has opted to subsidize medically necessary services generally, but not certain medically necessary abortions, the fact remains that [the denial of government funds for an abortion] leaves an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all. [*Harris, supra,* pp 316-317.]

Thus, the United States Supreme Court concluded that the denial of public funds for an abortion does not infringe upon a woman's fundamental right to

choose this medical procedure. This examination is commonly referred to as the "obstacles" analysis and has been soundly rejected by members of the United States Supreme Court. See *Maher* at 482-490 (Brennan, J., dissenting). I, too, reject the "obstacles analysis" because it is illusive and misleading.

The Michigan Medicaid program is a state-administered plan designed to pay the costs of medical care for most welfare recipients and certain other poor individuals. Michigan chose to subsidize the health care costs of its indigent citizens by enacting 1966 PA 321, MCL 400.105 *et seq.*; MSA 16.490(15) *et seq.*

Once a woman is found eligible to receive Medicaid assistance, her access to quality medical care is theoretically the same as a person who does not require Medicaid assistance. In other words, Michigan's enactment of the Medicaid program removes a recipient's indigent status relating to medical care. With the enactment of § 109a, however, a female recipient may obtain access to the full range of medical treatments provided under this program *unless* she chooses abortion as a medical treatment. The government's restriction of Medicaid funds for a medically indicated abortion, in fact, creates the financial "obstacles" that the Medicaid program purposefully eliminated. Such a restriction is clearly an infringement upon a woman's freedom of choice.

In most instances, services provided under Medicaid represent an indigent woman's sole access to health care. While the government may restrict its use of public funds, such action is inappropriate here where the effect is that an indigent woman's freedom of choice is altered to accommodate the government's agenda. Justice Brennan stated in *Harris, supra:*

The fundamental flaw in the Court's . . .
analysis . . . is its failure to acknowledge that the
discriminatory distribution of the benefits of gov-
ernmental largesse can discourage the exercise of
fundamental liberties just as effectively as can an
outright denial of those rights through criminal
and regulatory sanctions. [448 US 334.]

Here, too, the differential distributions of incen-
tives under § 109a have the same effect as an
outright prohibition of an indigent woman's exer-
cise of her fundamental right.

Furthermore, the complex design of welfare in
Michigan contributes to the burdensome effect of
§ 109a. Under the current scheme, if a woman
receiving Medicaid or Aid to Dependent Children
(ADC) benefits fails to report the receipt of other
income and assets, she could become disqualified
for future benefits. MCL 400.40-400.43; MSA
16.440-16.443. If an indigent woman received funds
from an outside source to finance an abortion, her
total monthly welfare benefits could be proportion-
ately reduced. *Id.* Because payments are made
directly to the provider and no cash allowance is
given for medical assistance, she is not even given
the choice of waiving other medical necessities in
favor of a medically indicated abortion. Conse-
quently, a woman who chooses to have the abor-
tion must forgo housing or care for her family if
she wants this medical treatment. See Corns, *The
impact of public abortion funding decisions on
indigent women: A proposal to reform state statu-
tory and constitutional abortion funding provi-
sions,* 24 U Mich J L Ref 371, 388 (1991).

Considered in context with an indigent woman's
entire financial circumstance, the coercive effect of
§ 109a on a woman's procreation choice is obvious.
Faced with the denial of benefits, an indigent
woman is pressured into carrying the fetus to

term, notwithstanding her choice to have an abortion, and the sometimes substantial impairment to her physiological and psychological health.

## II

For these reasons, I find that § 109a unduly burdens a woman's fundamental right to privacy and thus is subject to judicial review under the "strict scrutiny" analysis.

When examining violations of the Equal Protection Clause where a fundamental right is implicated, this Court has adopted the "strict scrutiny" analysis employed by the United States Supreme Court. *San Antonio Independent School Dist v Rodriguez*, 411 US 1, 17; 93 S Ct 1278; 36 L Ed 2d 16 (1973), reh den 411 US 959 (1973). If the legislation impinges upon a fundamental right or involves a suspect classification, the government must demonstrate a compelling interest or the legislation fails. See *Manistee Bank & Trust Co v McGowan*, 394 Mich 655, 668; 232 NW2d 636 (1975). If a fundamental right is not implicated, the legislation must be rationally related to a legitimate government purpose. *Id.*

In *Roe v Wade, supra,* the United States Supreme Court identified two governmental interests in procreative choices: (1) a woman's health, and (2) the potential life of the fetus. However, the government's interest in the potential life of the fetus does not become compelling until the fetus is viable. *Id.* at 163-164. Thus, the only compelling government interest in a woman's procreation choice before the third month is the protection of a woman's own health. Prohibiting reimbursement for abortions under § 109a in *all* trimesters does not advance the government's compelling interest in the health of the woman or the child. In fact,

such action exceeds the balance between the government's interest and the constitutional right of the woman to be free from government interference in her procreative decisions. The Michigan Legislature's decision to deny Medicaid reimbursements to an indigent woman who seeks a medically indicated abortion but provides funding to a woman who chooses childbirth as a medical treatment for her pregnancy cannot survive the strict scrutiny analysis.

III

The exercise of fundamental rights cannot be a vain endeavor. The State of Michigan remains bound by the decision in *Roe v Wade* that legalized abortion. To argue that a woman has a right to an abortion but that the government need not allow her access to this service renders *Roe v Wade* meaningless.

But for the United States Supreme Court decisions in *Harris, Maher,* and *Beal, supra,* several courts would find Medicaid limitations on abortions unconstitutional. *Doe v Rampton,* 366 F Supp 189 (D Utah, 1973) (Medicaid funding and the right to choose abortion are inseparable); *Coe v Hooker,* 406 F Supp 1072 (D NH, 1976) (abortion is an alternative treatment of pregnancy, and the state may not arbitrarily restrict a Medicaid recipient's choice of treatment); *McRae v Mathews,* 421 F Supp 533 (ED NY, 1976) (the freedom to choose an abortion is an "unreal" right if indigents cannot receive Medicaid subsidy).[3]

Similarly, several states have enacted legislation that would provide government-funded abortions where an indigent woman has become pregnant as a result of rape or incest. *Preterm, Inc v Dukakis,*

---

[3] See Corns, *supra* at 389-391.

591 F2d 121 (CA 1, 1979), cert den 441 US 952 (1979), app dis 448 US 901 (1980); *Doe v Busbee,* 471 F Supp 1326, 1329 (ND Ga, 1979). These decisions represent a recognition on the part of legislatures that the choice to become pregnant in the first place does not always rest with a woman and, thus, the state need not penalize her when she is victimized. Section 109a permits no such recognition. Moreover, the inflexibility of § 109a exhibits the Michigan Legislature's unwillingness to coöperate with the health needs of women requiring Medicaid assistance. Such action is reprehensible.

Contrary to the majority's assumption, a Medicaid recipient's access to private funds to finance a medically indicated abortion, or any medical treatment for that matter, is scarcely a reality in the State of Michigan.[4] Jane Doe is hardly a prototype of pregnant indigent women, the majority of whom are not as fortuitous to have their situation addressed by the Michigan Supreme Court. Shortly after plaintiff Nancy Doe's request for medical assistance for a first-trimester abortion for her daughter was denied, plaintiff Jane Doe was presented with private funds for her abortion. However, the availability of private funds for Jane Doe's abortion can only be attributed to the notoriety of her situation.

As Justice Powell pointed out in *Healy v James,* 408 US 169, 183; 92 S Ct 2338; 33 L Ed 2d 266 (1972), "[w]e are not free to disregard the practical realities." Michigan's equal protection guarantees are based on the premise that laws must not unfairly prejudice similarly situated persons. The Michigan Legislature does not possess unlimited

---

[4] See note, *The effect of recent medicaid decisions on a constitutional right: Abortions only for the rich?* 6 Fordham Urb L J 687, 710 (1978).

authority to enact laws on the basis of popular moralistic objectives that encroach upon constitutionally protected freedoms. See *Marbury v Madison,* 5 US (1 Cranch) 137; 2 L Ed 60 (1803). When this occurs, "the courts are entrusted with the responsibility to review and the power to nullify legislative acts which are repugnant to the constitution." *Manistee Bank, supra* at 666.

The State of Michigan has accepted the responsibility of equitably providing medical services by enacting the Medicaid program. By denying an indigent woman access to a medically accepted and constitutionally protected abortion when medically indicated by her treating physician, the Legislature denies her equal protection under the law of the State of Michigan.

I would affirm the decision of the Court of Appeals that found that § 109a is unconstitutional under Michigan's Constitution.

BOYLE, J. (*dissenting*). The question before us is whether an otherwise qualified indigent fifteen-year-old, who became pregnant as the result of a rape, may be denied benefits for a first-trimester abortion necessary to preserve her health. I agree with Justice MALLETT's conclusion that benefits may not be denied. I write separately to briefly address my reasons for this result and the more narrow remedy I believe appropriate.

This Court has proceeded cautiously in declaring rights under our constitution that differ from those enumerated by the United States Supreme Court, *People v Catania,* 427 Mich 447; 398 NW2d 343 (1986). We have explicitly recognized the right to do so. *Reist v Bay Circuit Judge,* 396 Mich 326; 241 NW2d 55 (1976) (an indigent parent is entitled to counsel on appeal from a decision terminating parental rights); *Delta Charter Twp v Dinolfo,* 419

Mich 253; 351 NW2d 831 (1984) (an ordinance prohibiting unrelated persons from living together was violative of the Due Process Clause of Michigan's Constitution):[1]

The high priority accorded in Michigan to equal protection, art 1, § 2, to equality of benefits, art 1, § 1, and to protection of health, art 4, § 51, counsel rejection of the analysis in *Harris v McRae,* 448 US 297; 100 S Ct 2671; 65 L Ed 2d 784 (1980), reh den 448 US 917 (1980).[2] I would conclude that the statute burdens a fundamental right under the Michigan Constitution by selectively denying benefits for first-trimester, medically necessary abortions.[3] The statute in question, unlike any in our jurisprudence, selectively focuses on one of two choices of a constitutionally protected decision and penalizes the exercise of the disfavored option, requiring women to sacrifice their medical needs in the first trimester of pregnancy to the interest of the state in potential life.

It is beyond dispute that *Roe v Wade,* 410 US

[1] See also *Manistee Bank & Trust Co v McGowan,* 394 Mich 655; 232 NW2d 636 (1975) (plurality opinion holding the guest passenger exception unconstitutional as violative of the Equal Protection Clause of the Michigan Constitution after the United States Supreme Court upheld a similar statute challenged pursuant to the Fourteenth Amendment), and *Traverse City School Dist v Attorney General,* 384 Mich 390; 185 NW2d 9 (1971) (a proposal barring nonpublic school students from shared time and auxiliary services at public schools was deemed to deny equal protection and burden the free exercise of religion).

[2] This conclusion has been endorsed by virtually every state court confronted with the question. See *Committee to Defend Reproductive Rights v Myers,* 29 Cal 3d 252; 172 Cal Rptr 866; 625 P2d 779 (1981), *Doe v Maher,* 40 Conn Supp 394; 515 A2d 134 (1986), *Moe v Secretary of Administration & Finance,* 382 Mass 629; 417 NE2d 387 (1981), *Right to Choose v Byrne,* 91 NJ 287; 450 A2d 925 (1982), and *Hope v Perales,* 150 Misc 2d 985; 571 NYS2d 972 (1991).

[3] Although the claim in question has been characterized as positing the recipient's right vis-à-vis that of a nonviable fetus (The Detroit Chapter of National Organization of Women of Michigan, amicus curiae, p 16), the plaintiff's complaint alleges that "a first trimester abortion is medically necessary . . . ."

113, 163-164; 93 S Ct 705; 35 L Ed 2d 147 (1973), reh den 410 US 959 (1973), established a right to be free from state interference in an abortion decision, at least before the end of the first trimester, and held that even when the state's interest in potential life is compelling, "it may go so far as to proscribe abortion . . . except when it is necessary to preserve the life *or health* of the mother."[4] (Emphasis added.) In *Doe v Bolton,* 410 US 179, 193, 195, 197; 93 S Ct 739; 35 L Ed 2d 201 (1973), the Court invalidated a "hospital requirement . . . [that] fails to exclude the first trimester of pregnancy," an accreditation requirement not imposed on any other medical procedure apart from abortion, and a statutory requirement of approval by a hospital committee, because "[t]he woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview."[5]

In my view, the statute does not survive analysis under our state constitution, first, because the protection of health lies at the core of the interest identified in *Roe v Wade,* second, because implementation of the right is within the protection provided by *Doe v Bolton,* and, finally, because withholding a medically necessary benefit when virtually all other medically necessary health care benefits are provided is a coercive burden on exercise of the protected right.

[4] It is widely speculated that the life expectancy of *Roe* is questionable. However, the State of Michigan is bound by that decision. Whether we would separately recognize the right if *Roe* were overturned is a different question.

[5] As Justice O'Connor has noted, the Court's disapproval of these requirements was clearly based "on the fact that the State did not impose them on any other medical procedure . . . ." *Akron v Akron Center for Reproductive Health,* 462 US 416, 465, n 9; 103 S Ct 2481; 76 L Ed 2d 687 (1983) (O'Connor, J., dissenting).

Simply stated, because *Roe v Wade* squarely holds that state interference is unreasonable if it attaches a greater importance to the interest in potential life than to the interest in protecting the mother's health, *Harris v McRae* is wrong, if *Roe v Wade* is right. While the state has no obligation to fund private choice, when the state opts to fund medical procedures concerning pregnancy for indigent women, it may not penalize the disfavored option by conditioning the receipt of the benefit on waiver of the protected right.[6]

The United States Supreme Court decisions in *Maher v Roe,* 432 US 464; 97 S Ct 2376; 53 L Ed 2d 484 (1977), *Harris v McRae, supra,* and *Williams v Zbaraz,* 448 US 358; 100 S Ct 2694; 65 L Ed 2d 831 (1980), rest on the assumption that the right established in *Roe* is a negative right to be let alone. From this assumption, it follows that the baseline for measuring whether the enactment in question is coercive is whether it constitutes a burden on the right to choose.[7]

---

[6] *Bob Jones Univ v United States,* 461 US 574; 103 S Ct 2017; 76 L Ed 2d 157 (1983), does not provide authority to the contrary. In *Bob Jones,* the Court approved an Internal Revenue Service policy that eliminated the school's tax-exempt status because it maintained a racially discriminatory admissions policy. The Court did not conclude that the elimination of a previously offered benefit could never constitute a burden. Rather, the Court noted that not all burdens are unconstitutional before concluding that the state's compelling interest in eradicating racial discrimination in education overrode any burden that denial of the tax benefits placed on the petitioners' exercise of their religion. *Id.* at 603-604.

[7] The funding cases provide part of the theoretical basis for the undue burden method of analysis in the abortion context first articulated by Justice O'Connor in *Akron v Akron Center for Reproductive Health,* n 5 *supra* at 452-453. Justice O'Connor also suggested in *Akron* and in *Planned Parenthood Ass'n v Ashcroft,* 462 US 476; 103 S Ct 2517; 76 L Ed 2d 733 (1983), that health regulations throughout pregnancy may never constitute undue burdens. I do not here have need to question Justice O'Connor's view that the interest in maternal health and potential for life is extant throughout pregnancy, or the view that the broad rationale of *Roe* was overstated. However, she "has yet to suggest a substitute for trimesters," regarding regulations

In *Maher, supra* at 474-475, ns 8-9, the Court rejected the conclusion of the district court that a state statute excluding medicaid-funded benefits for a nontherapeutic abortion infringed on a fundamental interest, characterizing the right involved as the freedom to decide whether to terminate a pregnancy. The Court distinguished *Sherbert v Verner,* 374 US 398; 83 S Ct 1790; 10 L Ed 2d 965 (1963), and *Shapiro v Thompson,* 394 US 618; 89 S Ct 1322; 22 L Ed 2d 600 (1969), on the apparent basis that because those cases had withdrawn benefits as a "consequence" of conduct, they were more analogous to penalties on the exercise of constitutional rights.

In *Harris v McRae,* a closely divided Court extended the *Maher* analysis to uphold funding restrictions for medically necessary abortions, once again distinguishing *Shapiro* and *Sherbert* on the basis that a refusal to fund protected activity "without more" cannot be equated with the imposition of a "penalty" on that activity. 448 US 317, n 19. The Court concluded that the government's funding choice involved only a failure to act, rather than affirmative conduct "place[ing] . . . obstacle[s] in the path," *Harris* at 315, of the exercise of the right. This approach can be characterized as legally reinforcing the "special vulnerability of women," even at the risk of their health.[8]

Thus, *Maher* and *Harris* avoided the holdings in *Roe* and *Doe v Bolton* by recharacterizing the

that seek to preserve potential life. Estrich & Sullivan, *Abortion politics: Writing for an audience of one,* 138 U Pa L R 119, 141 (1989). Nor has Justice O'Connor or a majority of the United States Supreme Court ever said that all regulations that further the interest in potential life are "automatically compelling." *Id.* at 145. As both the authors and Justice Scalia in *Webster v Reproductive Health Services,* 492 US 490, 536-537; 109 S Ct 3040; 106 L Ed 2d 410 (1989), observe, there is a logical contradiction between Justice O'Connor's description of possible viability and the survival of *Roe.*

[8] Tribe, American Constitutional Law (2d ed), § 15-10, p 1355.

right in question from the right to be free from state interference in the decision to terminate a pregnancy to a right to be free of unduly burdensome interference in choosing whether to terminate or continue a pregnancy. This recharacterization set the stage for differentiating the abortion issue from decisions that invalidated the conditioning of governmental benefits on the exercise of fundamental rights.[9] In my view, however, the statute involves not simply a failure to extend benefits, but the government's withdrawal of already extended benefits to medical care during pregnancy. Moreover, the purported indirectness of the effect was not a significant factor in *Sherbert,* or other benefit cases.[10] Further, the assumption that the statute is less coercive than those considered in *Sherbert* and *Shapiro* is problematic. Given the fact that there was no serious inquiry regarding the alternatives available to the plaintiffs in *Harris,* the difference in results appears explainable only in terms of the Court's differential ranking of the rights involved.[11]

This is not a situation in which a state's neutral, generally applicable law, indirectly burdens a fundamental right.[12] This is a case in which the state selectively and intentionally funds one protected option while withdrawing funds from the other, pressuring the right to select the disfavored op-

[9] The plaintiff here is being deprived of something that is hers, her health, just as surely as the Sabbatarian in *Sherbert* was deprived of unemployment benefits because of her refusal to accept work.

[10] See Failinger, *An offer she can't refuse: When fundamental rights and conditions of government benefits collide,* 31 Vill L R 833, 837, n 11 (1986).

[11] The right involved is not unlimited. That observation, however, begs the question as to whether the state may engage in rights-pressuring activity for the period of time and under the circumstances in which, the freedom from interference has been held to be fundamental.

[12] *Employment Div, Dep't of Human Resources v Smith,* 494 US 872; 110 S Ct 1595; 108 L Ed 2d 876 (1990).

tion. The decision in *Harris* is inconsistent[13] with those benefit cases in which the Court has guarded against government overreaching to preserve preferred liberties.[14]

One would expect to see no protection provided where recipient benefits are endangered merely because of circumstances unrelated to the reasons for the state's action as in *Sherbert, supra.* But because the statute upheld in *Harris* is actually more coercive than the statutes invalidated in *Sherbert* and *Shapiro v Thompson,*[15] or the statute upheld in *Employment Div, Dep't of Human Resources v Smith,* 494 US 872; 110 S Ct 1595; 108 L Ed 2d 876 (1990), the Supreme Court has not "coherently articulated the values at stake in conditions statutes."[16] Failinger, *An offer she can't*

---

[13] Nor is *Harris* consistent, as applied to these plaintiffs, with the results of intermediate scrutiny applied in *Plyler v Doe,* 457 US 202; 102 S Ct 2382; 72 L Ed 2d 786 (1982), reh den 458 US 1131 (1982) (invalidating a statute because it imposed a lifetime hardship on a discrete class not accountable for their disabling status, involving no suspect class or fundamental right). The notion that government has no obligation to save people from the consequences of their own inability to purchase services that those more frugal would be able to purchase is refuted in this context. While we do not deal here with the questionable assumption that all pregnancies are voluntary, that is surely not true of Jane Doe. By operation of this statute, a minor, whose pregnancy results from a rape, is placed in a discrete class and denied medically necessary health care for exercising her right to terminate a pregnancy for which she is no more accountable than those who were disadvantaged by the classification in *Plyler.*

[14] This analysis does not call in question the well-established principle that heightened governmental justification is required only when a law burdens a fundamental right to some minimum degree. *San Antonio Independent School Dist v Rodriguez,* 411 US 1; 93 S Ct 1278; 36 L Ed 2d 16 (1973), reh den 411 US 959 (1973).

[15] Nor do I find persuasive the Court's distinction of *Sherbert* as a case that involved denial of benefits, rather than a mere refusal to subsidize. "Whether the State withholds only the special costs of a disfavored option or penalizes the individual more broadly for the manner in which she exercises her choice, it cannot interfere with a constitutionally protected decision through the coercive use of governmental largesse." *Harris v McRae, supra* at 336, n 6. (Brennen, J., dissenting.)

[16] Another commentator has put the criticism more bluntly:

*refuse: When fundamental rights and conditions of government benefits collide,* 31 Vill L R 833, 835 (1986).

Because I believe that the statute intrudes on the constitutionally protected decision, I need only observe further that a statute that makes serious health damage to the mother a more attractive alternative than abortion does not rationally promote the government's interest in encouraging normal childbirth, under either strict or intermediate scrutiny. The only rationale advanced—to discourage medical procedures otherwise necessary to preserve the health of the mother—would justify the total elimination of the right recognized in *Roe v Wade.* Indeed, in *Harris,* Solicitor General Wade McCree acknowledged that the logic of the Court's position would justify denial of funding even if abortion was the only life-saving procedure available. *Id.* at 354.

The intervening defendant acknowledges that the statute is not neutral. The governmental purpose is to enforce the discouragement of all abortions that do not threaten the life of the mother. This case thus presents a conflict between two fundamental principles—whether one's body shall be the source of another life, even at the expense of health, and "a command that is no less fundamental [that] an innocent life may not be taken

[T]he abortion funding cases turned on the supposed absence of "coercive" acts . . . . It is perhaps the worst mistake in current unconstitutional conditions analysis that such flagrant instances of rights-pressuring intent have been immunized on the theory that government has committed no coercive act. [Sullivan, *Unconstitutional conditions,* 102 Harv 1415, 1500-1501 (1989). See also Perry, *Why the Supreme Court was plainly wrong in the Hyde Amendment case: A brief comment on* Harris v McRae, 32 Stan L R 1113, 1117-1118 (1980); Tribe, *The abortion funding conundrum: Inalienable rights, affirmative duties, and the dilemma of dependence,* 99 Harv L R 330 (1985).]

except to save the life of another."[17] The state has no obligation to fund private choice. It may reward choices that promote its interest. However, when the state opts to fund medical procedures concerning pregnancy for indigent women, it may not condition the benefits on waiver of the right in a manner that conflicts with the health of the mother.[18]

For the reasons stated, I concur in Justice MALLETT's result, but would narrow the remedy to hold that the statute may not be applied to women who seek first-trimester abortions necessary to preserve medical health.[19]

---

[17] Tribe, n 8 *supra,* p 1340.

[18] This body of jurisprudence has demonstrated that abstract notions of rights and pigeon holes framed to deal with other problems are less than adequate abstractions for resolving profoundly existential assertions regarding the interest in freedom from subordination of life and health to nascent life, and the competing moral and intellectually honest principle that all human life, fetal and adult, has value. Few decisions prove more difficult than those in which these absolutes stand opposed, and competing rights analysis sheds little light on the responsibilities of the individual claimant to the community, of the claimant to the potential life she carries, or the responsibility of the state to the claimant. Whether the United States Supreme Court will ultimately determine that the state's interest in protecting potential life is compelling even during the first trimester of pregnancy, it is fair to observe that, women like Jane Doe, "who will inevitably suffer serious physical or emotional injury . . . unless they can abort may legitimately argue that they have considered their responsibilities to others against their own lives [and] may also claim responsible action by the state . . . ." Failinger, *supra* at 929.

[19] The government may accommodate the interests of those taxpayers holding morally opposed positions to use of tax revenues for these purposes. See Tribe, n 16 *supra,* p 340, n 38. It may also invest in technology that pushes viability backward toward conception, thus increasing society's power to act responsibly toward the protection of fetal life.