Kelly, J.
(dissenting). I agree with the majority that the safe-harbor provision[1] of the Michigan Civil Rights Act (cra)[2] bars statutory liability under the cra where an employer acts in conformity with an approved affirmative action plan. I also agree that the mere existence of the safe harbor does not abrogate rights generally guaranteed under the Equal Protection Clause of the Michigan Constitution.[3] However, I can *817 not agree that acts of an employer that are protected by the safe harbor are subject to an equal protection challenge pursued directly under art 1, § 2. Accordingly, because I believe that our Legislature intended the CRA to provide the exclusive remedy for public employment discrimination claims within the act’s purview, I register my dissent.
Our constitution protects against discrimination at the hands of state actors by declaring that “[n]o person shall be denied the equal protection of the laws .... The legislature shall implement this section by appropriate legislation.” Const 1963, art 1, § 2 (emphasis added). We are bound to interpret these words in a manner that gives sufficient effect to the “law the people have made.” People v Reichenbach, 459 Mich 109, 119; 587 NW2d 1 (1998). The starting point for ascertaining the meaning of words used in the constitution is to interpret them according to their plain and ordinary meaning as understood by the people who adopted them. Bond v Ann Arbor School Dist, 383 Mich 693, 699; 178 NW2d 484 (1970).
I. THE CONSTITUTIONAL CONVENTION OF 1961
The reference to equal protection “of the laws,” found in both the state and federal constitutions, suggests a safeguard against the formation and execution of laws or legislative classification schemes that operate unequally. It is well settled that the equal protection guarantee is not a source of substantive rights or liberties; rather, it is a measure of a constitution’s tolerance of government classification schemes. Doe v Dep’t of Social Services, 439 Mich 650, 661; 487 NW2d 166 (1992), citing San Antonio Ind Sch Dist v *818 Rodriguez, 411 US 1, 24; 93 S Ct 1278; 36 L Ed 2d 16 (1973).
It seems likely from the convention record that delegates at the Michigan Constitutional Convention of 1961 had this principle firmly in mind as they formed art 1, § 2. Delegates from both political parties viewed the proposed equal protection clause as a general statement of Michigan’s policies and goals with respect to public discrimination. Drafters of art 1, § 2, envisioned legislators, not constitutional delegates, as the authorities vested with the power to implement those goals. James K. Pollock, Republican chairman of the Committee on Rights, Suffrage, and Elections for the 1961 convention, observed the following as he presented his committee’s proposed equal protection clause to the delegation:
We felt that, in the event we wanted to have a specific nondiscrimination clause, it would be better to state as a general policy of the constitution that there shall be no discrimination based on race, religion or national origin in the enjoyment of political or civil rights, and that the legislature should have the power to enforce this by appropriate legislation. [2 Official Record, Constitutional Convention 1961, pp 741-742 (emphasis added).]
To be sure, Delegate Harold Norris, a Democrat, expressed agreement with this basic principle of legislative delegation despite his disagreement with other aspects of the recommendation tendered by Pollock’s committee. Professor Norris described the constitution as “a statement of goals and not a detailing of means.” Id. at 742. Don Binkowski, another Democratic delegate on the Pollock committee, characterized the constitution as a guiding document that “must point the way” by providing a “strong, resolute *819 and bold restatement of the principles on which this country has been founded.” Id. at 746. He concluded his remarks to the delegation by observing “[i]t is up to you to include in the new constitution the statement of an individual’s rights to equal protection of the law . . . and to provide for legislative implementation of these principles.” Id.[4]
n. title vn
We have long recognized that federal courts’ interpretations of the law under circumstances analogous to those before us on review are highly persuasive although not necessarily binding on us. Continental Motors v Muskegon Twp, 365 Mich 191, 194; 112 NW2d 429 (1961). See, e.g., State Bd of Ed v Hough-ton Schs, 430 Mich 658; 425 NW2d 80 (1988).
There is no question that legislative bodies generally possess the power to enact detailed, comprehensive remedial legislation that preempts parallel claims brought directly under a constitution. The United States Supreme Court expressly recognized this fact in Smith v Robinson,[5] where it observed:
In light of the comprehensive nature of the procedures and guarantees set out in the [Education of the Handicapped Act] and Congress’ express efforts to place on local and state educational agencies the primary responsibility for developing a plan to accommodate the needs of each *820 individual handicapped child, we find it difficult to believe that Congress also meant to leave undisturbed the ability of a handicapped child to go directly to court with an equal protection claim to a free appropriate public education. Not only would such a result render superfluous most of the detailed procedural protections outlined in the statute, but, more important, it would also run counter to Congress’ view that the needs of handicapped children are best accommodated by having the parents and the local education agency work together to formulate an individualized plan for each handicapped child’s education. No federal district court presented with a constitutional claim to a public education can duplicate that process.
The Smith Court held that the Education of the Handicapped Act (eha) provided the exclusive avenue through which the plaintiffs could assert an equal protection claim for publicly funded special education.[6] Justice Blackmun recognized the possibility that broadly drafted legislation could preempt an entire field of substantive law. The Supreme Court further acknowledged that a comprehensive remedial act, *821 such as the eha, will rightfully preclude the availability of parallel constitutional claims because such duplication would undermine the thoroughness of the statutory scheme.
I find highly persuasive here the reasoning employed by the United States Supreme Court in Smith. It is the same rationale that backed the Court’s earlier holdings that Congress intended title vn[7] to provide the exclusive judicial remedy for discrimination claims in the federal employment sector. See Brown v General Services Administration[8]; Great American Fed S & L Ass’n v Novotny[9]; Davis v Passman.[10]
Brown involved an African-American federal government employee who claimed that the General Services Administration (gsa) had racially discriminated against him by failing to promote him to a higher grade. He filed a complaint with the GSA, then appealed to the federal Civil Service Commission, both of which ruled against him. He then appealed from the commission decision to a federal district court. The suit alleged jurisdiction under title vn as amended by the Equal Employment Opportunity Act of 1972,[11] the general federal-question statute,[12] the declaratory judgment act,[13] and the Civil Rights Act of *822 1866, as amended.[14] The district court dismissed the entire action for failure to conform to the procedural requirements of § 717 of the Civil Rights Act of 1964.[15] The Court of Appeals affirmed. Brown v General Services Administration, 507 F2d 1300 (CA 2, 1974).
In deciding the case, the Supreme Court engaged in a detailed review of the legislative history underlying the enactment of the 1972 amendments to title vn. It noted that comprehensive administrative, judicial, and remedial schemes have been included there. It viewed the enactment of § 717 as clear evidence of what Congress intended when it passed the 1972 title vn amendments. It quoted extensively from committee reports and floor debates to ascertain the will of Congress, before concluding:
This unambiguous congressional perception seems to indicate that the congressional intent in 1972 was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination. [Brown, 425 US 828-829.]
Brown denounced the idea that circuitous pleading might enable a party to avoid the preemptive scheme set forth in title vn. It observed that an attempt to circumvent the command of title vn would defeat Congress’ purpose of amending the statute in 1972.
The crucial administrative role that each agency together with the Civü Service Commission was given by Congress in the eradication of employment discrimination would be eliminated “by the simple expedient of putting a different label on (the) pleadings.” It would require the suspension of disbelief to ascribe to Congress the design to allow its care *823 ful and thorough remedial scheme to be circumvented by artful pleading. [Brown, 425 US 833, quoting Preiser v Rodriguez, 411 US 475, 489-490; 93 S Ct 1827; 36 L Ed 2d 439 (1973).]
Ultimately, the Supreme Court concluded that the plaintiffs other statutory claims were preempted by title vn. It affirmed the lower courts and held:
[T]he estabhshed principle [found in Preiser] leads unerringly to the conclusion that § 717 of the Civü Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment. [Brown, 425 US 835.]
Though the remedies sought in Brown were all statutory, its holding was broader and unqualified. In Novotny, supra, the Supreme Court made clear that Brown’s reasoning extended to encompass the notion that title vn preempts constitutionally based claims as well. Novotny brought an equal protection claim through the vehicle of § 1985(3),[16] and an action under § 704(a),[17] the retaliatory discharge provision of title vn. The Novotny Court relied on the principles set forth in Brown to hold that title vn foreclosed plaintiff’s equal protection claim. It recognized that the availability of parallel constitutional relief, under these circumstances, would dramatically undercut the effectiveness of title vn. Comparing Novotny to Brown, the Supreme Court stated:
Here, the case is even more compelling. In Brown, the Court concluded that § 717 displaced other causes of action arguably available to assert substantive rights similar to *824 those granted by § 717. Section 1985(3), by contrast, creates no rights. It is a purely remedial statute, providing a civil cause of action when some otherwise defined federal right — to equal protection of the laws or equal privileges and immunities under the laws — is breached by a conspiracy in the manner defined by the section. Thus, we are not faced in this case with a question of implied repeal. The right Novotny claims under § 704(a) did not even arguably exist before the passage of Title vn. The only question here, therefore, is whether the rights created by Title vn may be asserted within the remedial framework of § 1985(3). [Novotny, supra at 376.]
The Supreme Court answered this question in the negative. Applying Brown’s holding broadly,[18] it observed that restricting the plaintiff to an action under title vn was the only way to preserve the integrity of title vn’s remedial scheme. Notwithstanding Novotny’s broad constitutional claims, the Supreme Court continued:
If a violation of Title vn could be asserted through § 1985(3) [in the form of a constitutional claim], a complainant could avoid most if not aU of these detailed and *825 specific provisions of the law. . . . Perhaps most importantly, the complaint could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title vn. [Id. at 375-376.]
The majority responds that Novotny “did not involve any constitutional claim[s]” and therefore does not aid us in determining whether a statute can ever preempt a claim brought directly under the constitution.[19] My colleagues acknowledge that Novotny brought a claim under § 1985(3), but ignore the underlying substantive posture of any action pursued through the vehicle of § 1985(3). Although § 1985 is certainly a statute, it “creates no rights,” the Novotny Court observes, and is thus activated only “when some otherwise defined federal right — to equal protection of the laws or equal privileges and immunities under the laws — is breached by a conspiracy in the manner defined by the section.” Novotny, supra at 376. [Emphasis added.]
Hence, § 1985 is a remedial vehicle to pursue the vindication of constitutionally guaranteed rights. The Novotny Court was unequivocal when it declared that a violation of rights contemplated under title vn could not be asserted through a § 1985(3) claim. Id. at 375-376. It opined that pursuit of such a remedy would enable a complainant to “avoid most if not all of [the] detailed and specific provisions of the law.” Id. The majority is inaccurate in suggesting that using § 1985(3) to vindicate a violation of a constitutional right is substantively different than suing directly under the constitution.
*826 The majority uses its flawed analysis of Novotny as a springboard from which to leap to the general proposition that a legislative act can never “trump” the constitution. Nowhere in Novotny can one locate the principle that the majority attributes to it. Indeed, when the Supreme Court has addressed the subject of statutory preemption of constitutional remedies, it has reached the opposite conclusion.[20] It cannot be accurately said that Novotny lends credence to the conclusion that a constitutional claim can never be preempted by statute.
The majority is unpersuasive in its attempt to distinguish Smith v Robinson, the Supreme Court case that directly addresses the principle of statutory preemption of parallel constitutional claims.[21] As discussed above, the Smith Court held that a complainant’s equal protection claim was preempted by a statute, the eha. The majority reads Smith to mean only that “if a statutory remedy is available for an alleged constitutional violation, a party may be required to seek to remedy that alleged constitutional violation through the procedures provided by the statute.” Ante at 808. It then finds that Miss Smith’s claims were covered by the EHA and that Smith is inapposite here.
The flaw in its logic lies in its premise. In Smith, the principle claim involved the right of a handicapped child to a free public education. The claim that went to the United States Supreme Court was for *827 attorney fees. Under the facts in Smith, the plaintiff was covered by the act and was unable to obtain attorney fees under an equal protection claim. Under the facts in Sharp, plaintiff was covered by the act and sought relief for various equal protection claims. Hence, in each case a statutory remedy was available to and sought by the plaintiff and the plaintiff sought relief, as well, for the same alleged wrongs through a direct constitutional due process claim. Consequently, Smith is pertinent and supports my conclusion that a comprehensive legislative scheme can preempt certain constitutional claims where the Legislature is authorized and intends to preempt an entire field of law.
In attempting to distinguish the holding in Smith from the one I propose today, the majority points to a footnote in Smith. In it, the United States Supreme Court remarks that, if there were no statutory remedies for constitutional violations,
the power of federal courts to grant the relief necessary to protect against constitutional deprivations or to remedy the wrong done is presumed to be available in cases within their jurisdiction. [Id. at 1012, n 15, quoted ante at 808.]
This observation has no bearing on what the Court in Smith actually did decide: when the Legislature implements a comprehensive remedial scheme to rectify certain constitutional equal protection rights, the scheme will preempt parallel constitutional claims.
The footnote is dictum because the Smith Court found that Congress had implemented such a comprehensive remedial scheme in the eha. Examined closely, the footnote stands only for the proposition that, absent a statutory scheme to remedy equal pro *828 tection violations, courts can grant appropriate relief directly under the constitution.
This goes precisely to my point. Indeed, if there were no title vn, or no eha, there certainly would exist a role for the courts in remedying the constitutional deprivations those statutes address. The courts, within jurisdictional limitations, would fill the void in legislation and right wrongs through claims brought directly under the constitution. Yet the fact that Congress did enact such legislation is thought to manifest dissatisfaction with existing remedies the courts were providing. It is said to evidence a desire, instead, to replace unsuccessful solutions with a comprehensive scheme that preempts the field, including the very preexistent constitutional claims that warranted the legislation. Hence, the holding of Smith is that the eha’s legislative history leads to the conclusion that the act “is the exclusive avenue through which the child and his parent or guardian can pursue their claim.” Id. at 1013.
Therefore, despite the majority’s unsubstantiated assertion that a statute cannot “trump” the constitution, federal courts have long acknowledged the opposite principle.[22] Consistent with the logic working in Smith, these courts have applied Brown and Novotny to hold that title vn preempts constitutional equal protection claims that fall within the jurisdiction of the statute[23]. See, e.g., Ethnic Employees of *829 the Library of Congress v Boorstin, 243 US App DC 186, 196; 751 F2d 1405 (1985) (observing that “[a]llowing federal employees to recast their title vn claims as constitutional claims would clearly threaten those same policies”); Day v Wayne Co Bd of Auditors, 749 F2d 1199, 1204-1205 (CA 6, 1984); Kizas v Webster, 227 US App DC 327, 345; 707 F2d 524 (1983)(a Fifth Amendment claim based upon race and sex discrimination was barred by title vn); Purtill v Harris, 658 F2d 134, 137 (CA 3, 1981) (relying on Brown to hold that the Age Discrimination in Employment Act, modeled after title vn, preempts judicial remedies based directly on the constitution for claims of age discrimination in federal employment); Lawrence v Staats, 214 US App DC 438, 439-441; 665 F2d 1256 (1981) (a Fifth Amendment claim based on race discrimination would be barred if § 717 applied); Davis v Califano, 198 US App DC 224, 225, n 1; 613 F2d 957 (1979); Hofer v Campbell, 189 US App DC 197, 200; 581 F2d 975 (1978) (a Fifth Amendment claim based on national origin discrimination was barred by title vn); Richardson v Wiley, 186 US App DC 309, 310; 569 F2d 140 (1977); Gissen v Tackman, 537 F2d 784, 786 (CA 3, 1976); Lutes v Gol-din, 62 F Supp 2d 118 (D DC, 1999); Brug v Nat’l Coalition for the Homeless, 45 F Supp 2d 33, 42 *830 (D DC, 1999); Clement v Motta, 820 F Supp 1035 (WD Mich, 1991).
In Kizas, the United States Court of Appeals for the District of Columbia rejected a reverse discrimination claim, brought by white clerical and support employees of the Federal Bureau of Investigation. The complainants alleged that including affirmative action principles in the qualifying process for special agents violated their Fifth Amendment constitutional right to equal protection as well as their statutory title vn rights. The court concluded that the plaintiffs’ constitutional claim was “unavoidably foreclosed by [the] precedent” of Brown. Kizas, at 345. Their sole remedy was under title vn. The Kizas Court observed:
The Kizas complainants suggest, in repeated but less than lucid argument, that the Constitution’s equal protection principle entails a stricter restraint on classification by race or sex than does Title vn and would shelter them against “reverse” discrimination that the statute may permit. We need not linger over this suggestion. . . .
They may not circumvent the “carefid and thorough remedial scheme” Congress ordered for them; their access to court is determined by that effective, albeit demanding statute. [Kizas, at 345-346.]
m. THE CRA
In the instant case, Sharp is covered by the protections afforded through the CRA — a legislative enactment every bit as detailed and comprehensive as its federal counterpart, title vn.
Section 717 contains a general prohibition of federal employment “discrimination based on race, color, religion, sex, or national origin.” § 717(a). Michigan’s *831 CRA contains a proscription at MCL 37.2202(1), which provides in part:
An employer shall not . . . :
(a) Fail or refuse to hire, or recruit, or discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
Section 717 also provides the Civil Service Commission with the power and authority to enforce the civil rights requirements of title vn. Michigan vests its own Civil Rights Commission with similar enforcement powers. Article 6 of the cra delegates powers and duties to the commission, MCL 37.2601, and the Civil Rights Department, MCL 37.2602. Section 602(c) establishes in the Department the authority to
[r]eceive, initiate, investigate, conciliate, adjust, dispose of, issue charges, and hold hearings on complaints alleging a violation of this act, and approve or disapprove plans to correct past discriminatory practices which have caused or resulted in a denial of equal opportunity with respect to groups or persons protected by this act.
In addition, § 717(c) outlines a detailed administrative grievance procedure that a complainant must follow before filing suit in federal district court. It gives an aggrieved federal employee thirty days from a final order of the Civil Service Commission to register an appeal in a district court.
Michigan’s CRA provides an almost identical structure. See MCL 37.2605-37.2606. Section 605 requires the state commission to issue written findings of fact and conclusions of law to support a conclusion that an employer has engaged in discriminatory practices. *832 The section also details the various remedies available to the commission following a finding of discrimination in violation of the CRA. Finally, § 606 provides the complainant with the right to appeal from any final decision of the commission to a circuit court within thirty days.
' The parallels that exist between title vn and the CRA are undeniable. Similarly, the concerns apparent in Brown and Novotny about parallel claims that threaten to dilute the comprehensive scheme carefully crafted by Congress also exist here. Michigan’s cra provides the kind of detailed scheme that the United States Supreme Court recognizes as providing the sole remedy for claims arising under its coverage umbrella.
IV. LEGISLATIVE INTENT
Moreover, the language of the act, case law, and the legislative record persuasively support the proposition that our Legislature intended the CRA be the sole remedy for state employment discrimination claims in Michigan. The primary goal of statutory interpretation is to ascertain and give effect to the intent of the Legislature. Frankenmuth Mut Ins Co v Marlette Homes, Inc, 456 Mich 511, 515; 573 NW2d 611 (1998). Like title vn, the cra does not contain an express description of its position in the constellation of antidiscrimination law. Thus, it is appropriate to look for legislative intent in other, less obvious places. Brown, supra at 825. “Where the mind labours to discover the design of the legislature, it seizes everything from which aid can be derived . . . .” United States v Fisher, 6 US (2 Cranch) 358, 386; 2 L Ed 304 (1805).
*833 To begin, the language of the cra itself manifests an apparent intent to establish a broad, comprehensive scheme that “defines” and remedies violations of civil rights. The preamble to the CRA begins: “An act to define civil rights . . . . ” 1976 PA 453 (emphasis added). It continues by describing its own purpose as “to prohibit discriminatory practices” and “to provide remedies and penalties . . . .” Id. Thus, on its face, the cra shows that the Legislature envisioned it as comprehensive and detailed.
The legislative history, as gathered from House and Senate bill analyses generated before the act’s passage in 1976, bears out this suggestion. The legislative documents explain that the act was intended to address the problems caused by the splintered remedial systems that existed before 1976 in the area of civil rights. The report accompanying House Bill 4055 described the bill as a consolidation of these concepts into a single law that would
place legal and procedural recourse for all civil rights discrimination within the Department of Civil Rights, enabling the Department to provide more effective remedies for those who have been victimized by unlawful discrimination. [Emphasis added.]
The bill analysis further describes the bill as a means of “[outlining] more specifically the legal action a person could take if that person feels that he or she has been unfairly discriminated against.” (Emphasis added.) The “Argument For:” section of the bill analysis includes the following two statements of purpose, both bearing particular relevance to this case:
*834 The bill would provide a uniform statutory framework to deal with the many different forms of discrimination. [Emphasis added.]
* * *
The bill would include the concept of discrimination enunciated by the U.S. Supreme Court with respect to equal protection under the Constitution.
Hence, the cra, like its federal counterpart, was intended as a vehicle to define and consolidate the various remedial measures accorded by other statutes. Moreover, it was envisioned as incorporating the “concept of discrimination” inherent in the Equal Protection Clause.[24]
Courts have interpreted the CRA as bearing a singular objective in harmony with the Michigan Constitution and as an instrument to interpret and enforce its provisions. See, e.g., Thompson v Bd of Ed Romeo Comm Schs, 519 F Supp 1373, 1380 (WD Mich, 1981) (interpreting Michigan law to conclude that the “general object [of the cra] is to define and protect certain civil rights of individuals under the jurisdiction of Michigan law”); Neal v Dep’t of Corrections, 232 Mich App 730, 734; 592 NW2d 370 (1998) (“[t]he act is remedial and must be liberally construed to effectuate its ends”).
I find that the intent that appears to underlie the CRA supports the proposition that the Legislature meant it to provide the sole remedy for public *835 employment discrimination claims in Michigan. Moreover, the United States Supreme Court’s decisive interpretation in Brown, Novotny, and their progeny of the breadth of § 717 of title vn renders convincing guidance in determining the breadth of Michigan’s cra. Just as title vn provides the sole remedy for equal protection claims involving federal governmental employment discrimination, the CRA provides the sole remedy for Michigan governmental employment discrimination.
V. ANALOGY
A Michigan complainant like Mr. Sharp is in the same position as the complainants in Kizas. He may not circumvent the “careful and thorough remedial scheme” that the Legislature, in response to the direct call of the people, has ordered for him. Kizas, at 346. His access to court “is determined by that effective, albeit demanding, statute.” Id. He may not pursue a state constitutional equal protection claim that falls within the purview of the cra.[25] Allowing that a paral- *836 lei and circuitous claim would dilute the CRA’s purpose, just as allowing Novotny to seek constitutional redress would have diluted the carefully crafted scheme of title vn.
In addition to the persuasiveness of federal analogous law is the sheer counter intuitiveness of allowing an equal protection claim to survive in this case. If a complainant were entitled to relief under the state Equal Protection Clause as an alternative to the CRA, the safe-harbor provision would be dramatically weakened. If the safe harbor were destroyed, the CRA would fail in one of its essential purposes: to provide for affirmative action in order to alleviate past instances of discrimination.
In turn, the delegates to the 1961 Constitutional Convention would have failed in their attempt to draft art 1, § 2 as a set of policy goals “pointing the way” for the Legislature. Such a result is inconsistent with the expressed policy goals of the constitutional framers and the intent of the Legislature in enacting the CRA. In addition, it ignores the persuasive direction charted by the United States Supreme Court in Brown,[26] Novotny, and their respective progeny.
*837 VI. SHARP’S INADEQUATELY PLEADED CASE
A more detailed analysis of whether plaintiff has pleaded and preserved any other direct constitutional claim is appropriate here.
MCR 2.111 provides:
(B) Statement of Claim. A complaint, counter-claim, cross-claim, or third-party complaint must contain the following:
(1) A statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend[.]
In his second amended complaint, plaintiff pleaded as follows:
7. Notwithstanding rejection of Plaintiff’s application for employment as a fire fighter in the Lansing fire department, Defendant city of Lansing and the Lansing fire department have continued to accept applications for employment and have continued to hire persons as fire fighters who are not certified fire fighters and not as well qualified as Plaintiff.
10. Defendant city of Lansing and its fire department have limited, segregated or classified plaintiff in a way that tends to deprive him of employment opportunities in the public fire department of the city of Lansing, or otherwise *838 adversely affects his status as an applicant because of his race and sex.
* * :I:
13. Defendant city of Lansing has adopted a policy of discriminating in employment on the basis of race, sex and national origin by means of treating white male applicants for employment less favorably than applicants who are not white males.
14. Defendant city of Lansing has applied its policy of discriminating in employment on the basis of race, sex and national origin to the Lansing fire department.
15. Defendant city of Lansing and its fire department have manipulated facially neutral testing procedures to discriminate on the basis of race, sex and national origin by means of giving second, third and fourth chances to members of favored races, sex or national origin.
-i= * *
18. Defendant city of Lansing obtained approval for a voluntary affirmative action plan in 1987 but has abandoned the approved plan.
19. Defendant’s affirmative action plan lacks any rational connection with a legitimate governmental objective for the reason that ten years of enforcement of the said voluntary affirmative action plan has had no effect on the distribution of women and minorities in the non-supervisory ranks of the Lansing fire department.
20. Defendant city of Lansing adopted both its approved voluntary affirmative action plan, and its unapproved voluntary affirmative action plan with intent to discriminate on the basis of race and sex.
21. The only effect of ten years of voluntary affirmative action in the Lansing fire department has been to deprive white males of employment opportunities in the Lansing fire department.
22. Plaintiff has sustained damages in the premises in excess of $10,000.00, in violation of the form of the Elliott Larsen Civil Rights Act and Const 1963, art 1, § 2.
*839 Wherefore, Plaintiff prays that this Honorable Court enter its order enjoining Defendant city of Lansing from discriminating in employment on the basis of race, sex or national origin ....
Plaintiffs pleadings acknowledge the apparent constitutionality of an affirmative action plan that has been approved by the commission and enacted in conformity with § 210. There is no dispute that the city’s plan satisfies both criteria. In his answer to defendant’s affirmative defenses, plaintiff stated:
Plaintiff affirmatively avers that an affirmative action plan may be adopted and carried out “if the plan is filed with the commission under rules of the commission and the commission approves the plan.”
As the majority concedes, plaintiff is barred from pursuing a claim under the CRA. By extension, then, he has failed to state a cognizable claim under the Equal Protection Clause of the Michigan Constitution. Simply stated, he has nothing left to pursue on remand.
The majority misrepresents my position as asserting that the only way to challenge a state actor’s implementation of a law is to challenge the law itself. It interprets this dissent as in conflict with Batson v Kentucky, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986),[27] and Yick Wo v Hopkins, 118 US 356; 6 S Ct 1064; 30 L Ed 220 (1886).[28] In so doing, it overlooks a *840 crucial fact that distinguishes Batson and Yick Wo from the instant case: the relationship of the underlying “law” to the conduct alleged in this case is distinguishable from the relationship of those two variables as they operated in Batson and Yick Wo. The key difference is that § 210 expressly allows the conduct in which defendant engaged. It permits racial discrimination within certain parameters. The city of Lansing governed itself within those constitutional parameters. Though he tried, Mr. Sharp could not establish a factual issue to the contrary.
By contrast, the underlying law in Batson did not expressly allow the conduct in which the Kentucky prosecutor engaged. The “law” in Batson did not permit prosecutors to exercise peremptory challenges on the basis of race. It did not even address race. Thus, the unconstitutional implementation at work in Batson was found in the “deviation” from what the underlying constitutional law would allow. That “law” had been applied to Batson in a way that denied him equal treatment under it. I apply the same standard to Mr. Sharp’s claim, but reach a different result because the law in his case operated exactly as legislators intended it should.[29] There was no deviation from the scheme intended by the Michigan Legislature.
*841 However, despite Mr. Sharp’s failure to articulate a cognizable claim, another in his position would not necessarily be without a remedy. A complainant could challenge the constitutionality of the CRA generally, or of the safe harbor, testing whether either constitutes a constitutional implementation of art 1, § 2. Sharp chose not to do so. Alternatively, a complainant could challenge the commission’s approval of an affirmative action plan, arguing that the plan fails to conform to criteria required by the CRA for approval.[30] Again, Sharp chose not to pursue such a claim.
Finally, a complainant could articulate a challenge to a public employer’s actions in implementing a plan, by demonstrating that they fell outside the scope authorized by § 210. He could establish a fact question on such a claim by showing, hypothetically, that the employer hired a minority firefighter despite the fact that the individual had failed a required physical examination. Hiring such a candidate, who would not be qualified even with the benefit of the affirmative action plan, would not fall within the protection of the safe harbor. A complainant could establish a fact question whether the employer used some other unapproved plan, thereby violating complainant’s *842 rights. Such acts would not be protected by the safe harbor and the complainant’s art 1, § 2 rights could be vindicated under the cra.
Sharp attempted to create a fact question under certain of these theories, but failed. Hence, he is now left with nothing by way of an action arising either under the cra or directly under art 1, § 2. With no cognizable claims remaining that have not already been discharged, his cause was properly dismissed by the Court of Appeals.
vn. conclusion
I agree with the majority that the safe harbor protects the city of Lansing from an action against it under the CRA. I further acknowledge that the Legislature cannot abrogate constitutional rights through passage of a statute. However, the constitution can delegate authority. The cra is the Legislature’s response to one such constitutional delegation of authority. I believe that art 1, § 2, envisioned that the Legislature would pass an act like the cra that could be the exclusive remedy for vindicating civil rights claims against public employers in Michigan. I base this conclusion on the expressed intent of certain constitutional convention delegates and by analogy to a persuasive line of federal authority regarding title vn and the federal Equal Protection Clause. The CRA closely resembles title vn that the United States Supreme Court in Brown and Novotny held preempted the field of employment discrimination claims under federal law.
Allowing the pursuit of parallel constitutional claims to remedy wrongs cognizable under the CRA is *843 not only illogical, it threatens to undermine and destroy the comprehensive design of the statute. Such a contrary ruling could not reflect the intent of either the Legislature in passing the act or the people in adopting the Michigan Constitution.
The majority first misconstrues my position, then finds it “a startling proposition.” Ante at 810. It states my position as being that, if a state actor commits ongoing employment discrimination violative of the state Equal Protection Clause but not violative of the CRA, the courts cannot end the discrimination. My position is that, if a state actor commits employment discrimination by performing acts covered by the CRA, the state Equal Protection Clause cannot be used to end the discrimination.
I have demonstrated that this proposition has extensive support in holdings of the United States Supreme Court. Moreover, a contrary holding, the majority’s holding, sadly weakens the “noble contributions of the state and federal courts” in fighting discrimination that it purports to esteem.
The majority states that my reading of the law allows the Legislature to “trump” the Michigan constitution. It says that “it is axiomatic that the Legislature cannot grant a license to state and local governmental actors to violate the Michigan Constitution.” Ante at 810. However, a close examination reveals that this is mere rhetoric and misses the mark.
Without dispute, the constitution can delegate to the Legislature the task of devising a comprehensive statutory scheme to protect specific constitutional rights. Art 1, § 2 contains such a constitutional provision, and it is the one involved in this case. It is also beyond dispute that, when one person’s constitutional *844 rights conflict with another’s, courts will render a decision whereby one right is sublimated to the other.
This dissent, simply stated, stands for the proposition that, when a state actor discriminates against a person in a manner made lawful by the CRA, that person’s art 1, § 2 rights are sublimated to the art 1, § 2 constitutional rights of others to have the state actor discriminate in their interest. Art 1, § 2 delegated to the Legislature the power to implement it. In turn, the Legislature authorized the sublimation of one person’s equal protection rights over another’s when it created § 210.
The majority also distorts the meaning of the dissent when it asserts that I would prevent the Court from hearing plaintiff’s claim that defendant discriminated against him. It states that the dissent would prevent plaintiff from recovering for defendant’s acts that, although not violative of the CRA, violate the Due Process Clause. However, one should note, it neglects to specify the acts. What conduct by defendant does plaintiff claim violated art 1, § 2, but did not violate the CRA? In fact, plaintiff has named no governmental action by defendant that survived summary disposition, or that should have, and that, also, violated the Due Process Clause.
Here, Sharp cannot sue under the CRA because of the bar imposed by § 210. Both the nature of his claim and his pleadings preclude the availability to him of a parallel constitutional claim. The CRA provides his exclusive remedy. Because the Court of Appeals properly dismissed this action, I would affirm.

 MCL 37.2210.

 MCL 37.2101 et seq.

 Const 1963, art 1, § 2.

 See also Cramton, The powers of the Michigan Civil Rights Commission, 63 Mich L R 5, 13 (1964) (“[Under art 1, § 2,] the legislature is empowered to create and define the ‘civil rights’ that it feels are deserving of protection. The nature and scope of these rights, and the remedies available for their violation, are left to legislative judgment.”); Smith v Dep’t of Public Health, 428 Mich 540, 632; 410 NW2d 749 (1987) (Brickley, J.).

 468 US 992, 1011-1012; 104 S Ct 3457; 82 L Ed 2d 746 (1984).

 The statute was later amended by Congress to allow statutory and constitutional claims in tandem. Nevertheless, the reasoning of Smith still stands for the proposition that a comprehensive remedial scheme will preclude parallel constitutional claims. See Zombro v Baltimore Police Dep’t, 868 F2d 1364, 1368 (CA 4, 1989) (using Smith for the proposition that “[t]he Supreme Court has similarly demonstrated a disinclination to entertain § 1983 actions in which plaintiffs have bypassed a comprehensive statutory remedy in favor of a § 1983 claim predicated on an alleged constitutional violation”); Mattoon v City of Pittsfield, 980 F2d 1, 6 (CA 1, 1992) (relying on Smith for the conclusion that “even assuming a ‘fundamental constitutional right’ to safe public drinking water, it would not alter the present analysis. Comprehensive federal statutory schemes, such as the [Safe Drinking Water Act], preclude rights of action under § 1983 for alleged deprivations of constitutional rights in the field occupied by the federal statutory scheme”); Pfeiffer by Pfeiffer v Marion Center Area Sell Dist, 917 F2d 779, 789 (CA 3, 1990) (holding that Smith is part of a consistent application by the Supreme Court of the doctrine that a comprehensive enforcement scheme will preclude parallel constitutional claims).

 42 USC 2000e et seq. (This was the Civil Rights Act of 1964. References to § 717 and § 717a are to that act. Many courts refer to the section numbers from that act.)

 425 US 820, 835; 96 S Ct 1961; 48 L Ed 2d 402 (1976).

 442 US 366; 99 S Ct 2345; 60 L Ed 2d 957 (1979).

 442 US 228; 99 S Ct 2264; 60 L Ed 2d 846 (1979).

 42 USC 2000e et seq.

 28 USC 1331.

 28 USC 2201-2202.

 42 USC 1981.

 42 USC 2000e-16 (title TO), as amended in 1972.

 42 USC 1985(3).

 42 USC 2000e-3(a).

 The majority opinion relies on Davis, supra, for the proposition that a constitutional claim can proceed where a plaintiff is not covered by title vn. This is accurate. However, in analogizing the specific facts of Davis to this case, the majority overlooks the distinction that the claim at issue in Davis did not fail under the umbrella of title vn. The plaintiff there, by virtue of her status as a congressional employee, was not eligible for coverage under title vn. Thus, her ability to pursue a constitutional remedy would not undercut title vn’s remedial scheme. Indeed, the Davis Court reaffirmed Brown’s exclusivity principle.
By contrast, this case involves an individual, Mr. Sharp, who is protected by the applicable legislation, the CRA. He is not barred by having a status that renders him outside the scope of its contemplation. His inability to state a successful claim under the CRA does not place him in the same position as the plaintiff in Davis. Factually speaking, he more closely resembles the plaintiffs in Brown and Novotny, where the Supreme Court restricted access to alternative parallel remedies. Davis, supra at 247, n 26.

 Ante at 803.

 See Smith v Robinson, n 6 supra, which lists federal cases that apply Smith in finding a statutory preemption of constitutional claims.

 The majority chooses not to “burden readers of this opinion with a further discussion of case law from the lower federal courts,” ante at 809, but opts to ignore the considerable line of federal cases that have applied Smith to find statutory preemption of constitutional claims. See

 As stated in n 6, numerous federal cases have cited Smith as authority for making the type of ruling that the majority claims cannot be made.

 Some federal circuits have held that title vn does not necessarily provide the only remedy available for employment discrimination claims. See, e.g., Beardsley v Webb, 30 F3d 524, 527 (CA 4, 1994). However, many of these decisions dealt with claims arising from facts beyond the contem *829 plation of title vn, such that recognizing them would not encroach upon the area defined by title vn.
Even those circuits that have interpreted Brown narrowly have not, as the majority suggests, done so on the basis of any distinction between legal and equitable remedies. See, e.g., Annis v Westchester Co, 36 F3d 251 (CA 2, 1994); Notari v Denver Water Dep’t, 971 F2d 585 (CA 10, 1992). Instead, most have so held on the basis that they disagree about the scope of coverage that Congress intended. The majority offers no case holding that it is beyond the inherent power of any legislative body to enact a statutory scheme that preempts parallel constitutional claims.

 The Equal Protection Clause of Michigan’s Constitution is virtually identical to its counterpart contained in the Fourteenth Amendment of the United States Constitution. They are interpreted as embodiments of the same concepts. See, e.g., Moore v Spangler, 401 Mich 360, 370; 258 NW2d 34 (1977); Naudzius v Lahr, 253 Mich 216, 222; 234 NW 581 (1931).

 The majority intimates that Lewis v Michigan, 464 Mich 781; 629 NW2d 868 (2001), issued with this decision, holds that a complainant has a direct claim under the constitution for equitable relief from an approved affirmative action plan. Ante at 806, n 13. The issue in Lewis is whether this Court should recognize the existence of a claim for monetary damages directly under the Equal Protection Clause. It does not address whether a party can seek equitable relief under the auspices of the constitution.
The majority miscasts my position in this dissent as one that leaves certain Michigan citizens entirely without civil rights or constitutional protections. Also, it cites Bolling v Sharpe, 347 US 497; 74 S Ct 693; 98 L Ed 884 (1954) as assuming that Congress would amend title vn eighteen years later to retain the availability of equitable relief directly under the constitution. The use of a 1954 Supreme Court case to predict the effects of a legislative act in 1972 evidences a remarkable twist of the laws of time and space. Moreover, Bolling is inapposite because it describes federal *836 employment discrimination remedies that existed before 1972. The 1972 amendments of title vn were aimed at altering the legal foundation for pursuing federal employment discrimination claims in the public sector. Brown, Novotny, Smith, and each case upon which I rely, concern the state of employment discrimination law after 1972.

 To counter the unqualified, direct holding of Brown, the majority relies on a misreading of it. Brown does not state that the 1972 amendments to title vn left intact the availability of injunctive relief for federal employment discrimination directly under the Fifth Amendment. There is little question that the Brown Court regarded earlier remedies for employment discrimination in the public sector as impotent. See Brown, supra at 826 ("If administrative remedies were ineffective, judicial relief from federal employment discrimination was even more problematic before 1972.”) Injunctive relief, like the balance of remedies available before *837 1972, effected nothing to merit celebration among opponents of workplace discrimination.
According to the Brown Court, that was the weakness that Congress intended to address through the Equal Employment Opportunity Act of 1972. Its aim was to preempt the field by providing a comprehensive, exclusive slate of remedies, displacing existing legal and equitable claims. I find that our Legislature intended the cra to have similar preemptive force.

 Batson held that the federal Equal Protection Clause forbids a prosecutor from using peremptory challenges to remove potential jurors because of race.

 The Yick Wo Court found an equal protection violation where an otherwise neutral San Francisco city ordinance was applied unequally to citizens on the basis of race.

 Similarly, in Yick Wo, the law at issue did not expressly authorize discrimination on the basis of race. It established an approval process for operating certain types of laundry businesses in San Francisco. The process was used to deny business opportunities to Chinese immigrants, while granting them to non-Chinese applicants. The “law” in Yick Wo did not authorize city officials to treat Chinese applicants differently than others. Rather, it established a neutral permitting process. City officials applied that law unequally, thereby violating the equal protection guarantee of the constitution. Such a fact pattern is easily distinguishable from the instant case, where an admittedly constitutional statute prescribes the very discrimination from which plaintiff claims to have suffered.

 The concurrence is mistaken in its suggestion that I agree that the “safe harbor encompasses only affirmative action plans that are ladopt[ed] and carr[ied] out ... to eliminate present effects of past discriminatory practices or assure equal opportunity ....’” Ante at 815. The safe harbor does not protect only those plans that succeed in eliminating present effects of past discrimination. Section 210 contemplates protection for any properly approved plan that is reasonably created with the intention of eliminating discrimination or furthering equal opportunities in the workplace. The section specifically refers to plans “to” eliminate effects of discrimination, not plans “that” do in fact eliminate them. The concurrence’s sweeping interpretation, if accurate, would render the safe-harbor provision unworkable.